WESTBOROUGH MALL, INC., a Corporation; George Staples, Jr., and Westborough Mall Associates, a Missouri Limited Partnership, by and through George Staples, Jr., its Sole General Partner, Appellants,

v.

CITY OF CAPE GIRARDEAU, MISSOURI, a Municipal Corporation; Paul W. Stehr, Robert K. Herbst, Howard C. Tooke, Samuel L. Gill, Gail L. Woodfin, W.G. Lawley, Charles L. Drury, Drury Industries, Inc., a Corporation, May Department Stores Co., a Corporation, West Park Associates, a Missouri Limited Partnership, May Centers of Cape, Inc., a Corporation, and May Centers, Inc., a Corporation, Appellees.

No. 81–2314.

United States Court of Appeals, Eighth Circuit.

Submitted May 19, 1982.

Decided Nov. 12, 1982.

As Modified on Denial of Rehearing and Rehearing En Banc Jan. 17, 1983.

Robert E. Manley, Andrew S. Lipton, Manley, Jordan & Fischer, Cincinnati, Ohio, Robert H. Freilich, Martin L. Leitner, Freilich & Leitner, Kansas City, Mo., James R. Robison, Sikeston, Mo., for appellants.

Thomas C. Walsh, John Michael Clear, Michael G. Biggers, Stephen R. Snodgrass, St. Louis, Mo., for appellees Charles L. Drury, Drury Industries, Inc., The May Department Stores Company, West Park Associates, May Centers of Cape, Inc., and May Centers, Inc., Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., of counsel.

Stephen E. Strom, Finch, Bradshaw, Strom & Steele, Cape Girardeau, Mo., for appellees City of Cape Girardeau, Samuel L. Gill, Robert K. Herbst, W.G. Lawley, Paul W. Stehr, Howard C. Tooke and Gail L. Woodfin.

Before HEANEY, Circuit Judge, HENLEY,* Senior Circuit Judge, and BECKER,** Senior District Judge.

---

HEANEY, Circuit Judge.

This action was brought by Westborough Mall, Inc., and others to challenge actions taken by the City of Cape Girardeau, city officials and various private individuals and business concerns involved with the development of the West Park Mall, a shopping center located in the City of Cape Girardeau. The Westborough Mall developers claimed that the city illegally acted to deprive them of their zoning rights without due process of law. They also alleged that city officials and the West Park Mall developers illegally conspired to preclude competition by improperly reverting the C–4 zoning the Westborough developers had obtained to construct the Westborough Mall and then granting development rights to the West Park group. Finally, they asserted that two ordinances rezoning the West Park Mall property were illegal.

On October 27, 1981, the district court entered summary judgment in favor of the city and the West Park Mall developers, 532 F.Supp. 284. Although we agree with the district court that the Westborough developers lack standing to challenge the zoning changes granted to the West Park group, we find there is sufficient evidence that the city deprived the Westborough developers of their zoning rights without notice or a hearing to preclude a judgment as a matter of law. We also believe there are genuine issues of material fact regarding the existence of an illegal agreement between city officials and the West Park Mall developers to intentionally interfere with the progress of the Westborough Mall. We therefore reverse the district court in part and remand for a trial on the merits of these claims.

■■■ Our holding is based upon the established rule that summary judgment is justified only when, viewing the facts and inferences that may be derived therefrom in a light most favorable to the nonmoving

* Judge Henley assumed senior status June 1, 1982.

** The Honorable William H. Becker, United States Senior District Judge, Western District of Missouri, sitting by designation.

party, the court is convinced there is no evidence to sustain a recovery under any discernible circumstances. *Ralph's Distributing Co. v. AMF, Inc.,* 667 F.2d 670, 672 (8th Cir.1981); *Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076, 1077 (8th Cir. 1980). The burden is thus on the defendants to establish their right to judgment as a matter of law: there must be no genuine issue of material fact and no room for doubt or controversy. *See id.; St. Louis County Bank v. United States,* 674 F.2d 1207, 1209 (8th Cir.1982). A review of the facts in this case demonstrates why, in view of these standards, the district court erred in granting summary judgment.

Both plaintiff George Staples, Jr., and defendant Charles Drury, President of Drury Industries, Inc., had expressed interest in developing a shopping mall in the City of Cape Girardeau in the early 1970's. In 1973, Staples entered into a long-term lease on approximately sixty-seven acres of land for the purpose of constructing a regional shopping facility, referred to as Westborough Mall. On June 5, 1974, the Cape Girardeau City Council enacted ordinance 904, which rezoned the Westborough Mall property to C–4, a zoning change that the owners of the property had applied for upon the mayor's suggestion to Staples that C–4 zoning was required for the development of a regional facility. This ordinance exempted the property from another local ordinance, Chapter 30, § 31, subsection (e) of the Code of Ordinances, which provided that if a shopping center was not constructed on property rezoned C–4 within three years, the zoning would automatically revert to the classification in force prior to the establishment of the C–4 district.

It was not until several years after the plaintiffs obtained C–4 zoning that Drury Industries, Inc., and May Centers of Cape, Inc., formed a partnership to develop a competing center, the West Park Mall. The West Park Mall was to be located on land owned by Drury that was less than one mile from the Westborough site.[1] The gravamen of plaintiffs' complaint is that the city and the West Park Mall developers conspired to preclude competition by the plaintiffs by illegally reverting their C–4 zoning. The plaintiffs claim that this action was taken to allow the May-Drury defendants the opportunity to secure tenants and begin operation of the West Park Mall.

The district court held that there was no evidence of a conspiracy and, further, that any action taken by the city or the private defendants regarding the status of plaintiffs' zoning had no effect on the viability of plaintiffs' project, since plans for the development of Westborough Mall had not materialized and the project was in essence a failure. The plaintiffs argue that the existence of an illegal conspiracy may be inferred from the nature of the relationship between city officials and defendant Charles Drury and from the improper actions taken by the city to revert plaintiffs' C–4 zoning only two days after granting the defendants' zoning · petition, actions which allowed the defendants to complete their financing plans for the West Park Mall development. The plaintiffs also contend that there is a genuine issue of material fact as to the viability of their project, which renders summary judgment inappropriate.

The facts that support plaintiffs' position may be summarized as follows: Commencing in 1973, plaintiff Staples attempted to secure tenants for the Westborough Mall, especially anchor (or major) tenants such as J.C. Penney, Sears or Famous Barr. No major tenants expressed interest, however, and Staples abandoned his plans for approximately two years. Then, in September, 1976, Staples formed Westborough Mall Associates, a limited partnership, to develop the Westborough Mall site. The partnership raised $800,000 and received a building permit from the city in June, 1977. That same month, the city council enacted ordi-

1. The defendants concede that the two sites are equal in terms of development potential. The district court apparently assumed for purposes of deciding defendants' motions for summary judgment that Cape Girardeau was a "one shopping mall town." We adopt this assumption as well.

nance 1204, which corrected certain legal descriptions of the Westborough property and confirmed that the property was zoned C–4.

Site work on the Westborough project also began in 1977. Water drainage systems were installed, a survey was conducted and grading and other surface improvements were made. By December, 1978, the plaintiffs had expended more than $1 million on the development. No anchor tenants had yet committed themselves to the project, but letters of interest from many smaller stores had been received. Steps were being taken to secure additional financing to begin construction of the mall shell, and because of the reluctance of any major store to become a tenant, the plaintiffs were investigating a new anchor store concept—an "Elite" store composed of a number of small tenants.

Defendant Drury's plans for a shopping mall in Cape Girardeau were also proceeding during this time period. Drury sought to enter into a joint venture with the May defendants, who were experienced shopping mall developers. His discussions with May officials culminated in at least a tentative agreement with them to proceed to develop the West Park Mall in 1977. The agreement was a beneficial one in several respects, one of which was the probability of obtaining a Famous Barr store as an anchor tenant because Famous Barr was a subsidiary of May. An October, 1977, memorandum[2] by Drury to the Drury Industries Board of Directors suggested:

Participation by [May Stores] in the center does not automatically guarantee that a Famous Barr store will be in the center. However, the track record is that [May] is not involved in any center that does not have a first-line May department store in it. A Famous Barr store in Cape Girardeau is a calculated risk. With [May] participation in our center, however, it is very doubtful that Famous Barr, in the event it does not go in our center, will go in any other competitive center in our market area.

Drury's contribution to the joint venture included assistance in dealing with city officials. Indeed, Drury had received a letter from the city attorney as early as 1974, about the same time that plaintiff Staples was informed by the mayor that C–4 zoning was required to build a shopping mall, which indicated that Drury could proceed to develop his center with C–2 or regular commercial zoning.[3] As Drury later disclosed to May officials, his strategy was "low key." In 1977, he informed them that he already had talked with defendant Lawley, the city manager, and planned to talk with the mayor privately about obtaining C–2 zoning on all of the West Park Mall property. Drury believed that C–2 zoning would allow plans for the shopping mall to proceed in secret for as long as possible, thus avoiding any challenge by plaintiffs or others who might seek to thwart the development.

The evidence supports plaintiffs' suggestion that Drury and Lawley, the city manager, worked closely together to obtain the

2. Many of the facts in support of plaintiffs' claims are contained in documents produced by the defendants in discovery and submitted by the plaintiffs to the district court. The plaintiffs' requests for additional time for discovery to depose the private defendants were denied by the district court. The plaintiffs allege on appeal that the district court erred in this refusal. We find no abuse of discretion. *See Moore v. Sylvania Electric Products, Inc.,* 454 F.2d 81, 83 (3d Cir.1972).

The defendants challenge any reliance upon the documents submitted by the plaintiffs, alleging that they are an unauthenticated "hodge-podge" of notes that are inadmissible hearsay and should not be considered in evaluating the district court's grant of summary

judgment. The district court ruled that it considered "all the evidence submitted," and we believe the documents are sufficiently reliable for us to determine whether the record as a whole supports the district court's decision in this case. *See generally Alexander Dawson, Inc. v. NLRB,* 586 F.2d 1300, 1302–1303 (9th Cir.1978).

3. The city attorney's letter suggested that a C–4 classification was preferable, however, and Drury appears to have recognized that C–4 zoning would ultimately be required for a regional shopping facility. The city attorney's letter gave Drury the option of performing initial work with only C–2 zoning.

zoning change required for the West Park Mall property. After a September, 1978, meeting with Lawley and the city building commissioner and engineer, Drury told May officials that he had "tacit city approval for C–4 zoning for the shopping center site in exchange for the Silver Spring Road extension" right-of-way that he owned. Moreover, Drury reassured May officials that because the "center is desired by the powers that be," there was no risk in initially seeking C–2 zoning and worrying about the C–4 zone later. Indeed, a schedule adopted by the defendants for obtaining the necessary zoning was characterized by Drury as "C–2 zoning per Lawley schedule."

Finally Drury himself prepared the city manager's report to the city council concerning the West Park Mall's application for C–2 and then C–4 zoning. Lawley merely edited Drury's draft of this report prior to submitting it to the council on February 6, 1979. Drury's draft explicitly stated his desire to apply for C–2 zoning "with no mention of a subsequent or follow-up C–4 rezoning request."

Drury's zoning "strategy" raised some concerns with anchor tenants he was trying to attract to the West Park Mall, however. Notes of a phone conversation produced by Drury indicate that Drury's ability to obtain the required C–4 zoning was questioned by at least one prospective anchor tenant, J.C. Penney, even though Drury attempted to be very reassuring. "[Z]oning will not be a problem," Drury's notes stated, although because of plaintiffs' C–4 zoning, the J.C. Penney spokesperson could "hardly believe [Cape Girardeau] will zone * * * a second shopping center site."

Penney's concern regarding the West Park Mall zoning was important to the May-Drury defendants, since neither the plaintiffs nor the defendants had yet been successful in attracting anchor tenants. The West Park Mall was in direct competition with plaintiffs' Westborough Mall for these tenants, and the evidence in the record demonstrates that the defendants carefully monitored the plaintiffs' progress. For example, a June 6, 1978, memorandum

from a May official states that because "Cape Girardeau cannot support two centers," Famous Barr should decide quickly whether it was interested in participating in the West Park Mall. The memo suggested that because of reports concerning plaintiffs' competing site, "[o]ur partner, Charles Drury is insisting we attempt to firm up both J.C. Penney and Sears now, followed immediately by Dillards if Famous Barr has not made up its mind by the end of this month."

Drury's concern about plaintiffs' progress is also reflected in his notes in September, 1978—the same month he met with city officials concerning the West Park Mall's rezoning application. These notes somewhat cryptically state, "Staples—trouble—attack zoning." Drury also wrote in February, 1979, "stop them from building so we maybe get a chance to build." The plaintiffs allege that this is exactly what happened in April of 1979.

On April 4, 1979, the city council approved defendant Drury's C–2 zoning application for the West Park Mall, after a hearing at which the plaintiffs and others objected to the change. On April 5, plaintiff Staples filed suit in state court to challenge the city council's action. The next day, Lawley, the city manager, announced to the press that plaintiffs' zoning had reverted from C–4 to residential. The local television news and the Cape Girardeau newspaper carried the story. On April 11, 1979, after conferring with the city attorney, Lawley instructed the city engineer to change the city's master zoning map to show a reversion of the Westborough site from C–4 to its original zoning. The engineer followed these directions.

Lawley presented his opinion that plaintiffs' C–4 zoning had reverted by operation of Chapter 30, § 31, subsection (e) of the Code of Ordinances to the city council on April 13. Lawley said that because the plaintiffs had not built a shopping mall on their property within three years of the original C–4 grant in 1974, this ordinance operated to automatically revert their zoning to the classification in force prior to the

establishment of the C–4 district.[4] Lawley stated that the reverter would be applied to plaintiffs' property until he was ordered otherwise by the city council or a court. Although the city council discussed the issue, no action was taken at this meeting.

Thus, on April 20, 1979, a May official was able to report to a J.C. Penney official not only that the defendants' C–2 application had been granted, but also that

the City Council has reviewed the file of the zoning proceedings on the Westborough site. In doing so, they have concluded that because of the wording of the zoning regulations, requiring essential completion of the project within three (3) years from the date of an enactment of the C–4 ordinance, and since no construction on the site has begun, that the C–4 zoning on the Westborough site has expired and ground has reverted to its previous zoning status of M–1, light industrial, and R–1, residential. In a conversation with the City Manager, he informed me that he is revising the zoning map to reflect this change. He has also directed the engineering department not to issue a building permit for the Westborough project. It is probable that this action will be challenged and will ultimately be resolved in court. However, this would effectively preclude any development by the Westborough group until this issue is resolved.

On May 23, 1979, plaintiffs' financier, Green, wrote to the city manager requesting clarification of the status of the Westborough Mall's zoning. Lawley replied that, in his opinion, the C–4 zoning had reverted, and he enclosed a copy of the zoning ordinances and the official zoning map, which reflected the reversion, with his response. Green accordingly notified the plaintiffs that he was suspending his attempts to obtain permanent financing for plaintiffs' project until the zoning issue was resolved.

The West Park Mall developers then obtained a second rezoning of their property from C–2 to C–4 on August 1, 1979. Over the next year, the plaintiffs were unable to progress in the development of Westborough Mall. Work on the West Park Mall project continued and the mall ultimately was opened in 1981. It was not until September 17, 1980, almost a year and a half after the master zoning map was changed, that the city council adopted ordinance 1599, which "reaffirmed" that the Westborough Mall site was zoned C–4. As the plaintiffs had believed throughout, this ordinance confirmed that because the plaintiffs' C–4 grant was specifically exempted from the application of Chapter 30, § 31, subsection (e), no automatic reverter could be applied to the Westborough Mall site.

In view of these facts and the inferences that reasonable persons might draw from them, the plaintiffs contend on appeal that the district court erred in granting summary judgment on all seven counts of their complaint. We will consider each of the plaintiffs' allegations in turn.

## I.

■ In Count 1 of their complaint, the plaintiffs allege that the City of Cape Girardeau, the city manager and five city council members violated 42 U.S.C. § 1983. The plaintiffs challenge the district court's grant of summary judgment as to this count on the grounds that the court erroneously held that the city is immune from suit under section 1983, the city took no official action with respect to plaintiffs' zoning for the mall, and the acts of the defendants had no detrimental effect on plaintiffs' development.

In *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607 (8th Cir.1980), we held that local officials who acted in a legislative capacity were immune from suit under section 1983. *Id.* at 613–614. Our ruling was based in part upon the recognition that

---

4. Lawley was wrong; plaintiffs' zoning was exempt from the application of the reverter ordinance in the Cape Girardeau Code of Ordinances. The defendants argue that because the plaintiffs knew Lawley was wrong and failed to bring the error to his attention, they somehow waived their right to challenge his actions. This argument is clearly without merit.

municipalities may be held liable for unconstitutional conduct. *Id.* at 613. *See Owen v. City of Independence,* 445 U.S. 622, 657, 100 S.Ct. 1398, 1418–1419, 63 L.Ed.2d 673 (1980). The plaintiffs do not contend that the district court misapplied *Gorman* with respect to the individual city officials. Rather, they interpret the court's ruling as granting the city itself immunity, and argue that this holding must be reversed.

The city acknowledges that it may be liable under section 1983 if official action was taken to deprive the plaintiffs of their constitutional rights, and we believe that the district court's opinion does not hold to the contrary. In our view, the district court based its grant of summary judgment in favor of the city primarily on its view that no official action was taken by the city with respect to the alleged reversion of plaintiffs' C–4 zoning. On appeal, the city has argued that no official action was taken because the city manager's actions concerning the C–4 reversion were merely expressions of his own opinion and did not result in any change in the status of plaintiffs' zoning. In context of a motion for summary judgment, this contention cannot be accepted.

As chief executive officer of the city, the city manager is responsible for enforcing the city's zoning ordinances. *See* Mo.Rev. Stat. § 78.610(2). After conferring with the city attorney, city manager Lawley acted pursuant to this authority and directed that the official zoning map be changed to reflect a reversion of the zoning on plaintiffs' Westborough Mall site from C–4 to its prior classification. Lawley also instructed that no building permit should be issued for the mall. The city engineer followed these directions.

Moreover, although the city manager is "subject to the direction and supervision of the council," *id.,* Lawley communicated his opinion that Chapter 30, § 31, subsection (e) applied to revert plaintiffs' C–4 zoning to the city council, and told them of his instructions to the city engineer. The council enacted no ordinance explicitly ratifying Lawley's conduct, but an ordinance would

not necessarily be required if the council agreed with Lawley's position. The city's argument that a city manager's action becomes official policy only upon the enactment of a resolution by the council is thus unpersuasive in this situation, since by knowing inaction, the city may have ratified Lawley's action here.

The official zoning map of the city was changed to eliminate plaintiffs' C–4 zoning. Lawley, the mayor and the city engineer publicly stated that the plaintiffs had lost their C–4 zoning, and Lawley reiterated this position in his letter to plaintiffs' financier. This erroneous reversion was corrected when the city enacted ordinance 1599 "reaffirming" plaintiffs' right to C–4 zoning, but from April, 1979, to September, 1980, the plaintiffs were effectively deprived of their C–4 classification.

We therefore find that the district court erred in its summary judgment that the city took no official action with regard to Westborough Mall zoning. The actions by city officials in this case were not merely isolated incidents, *see Landrigan v. City of Warwick,* 628 F.2d 736, 746–747 (1st Cir. 1980), but rather may have represented the official policy of the city concerning the status of plaintiffs' zoning. *See Black v. Stephens,* 662 F.2d 181, 191 (3d Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982); *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 448 (2d Cir.1980). We find the plaintiffs have presented sufficient evidence that the reversion of their zoning "was caused by the official conduct of * * * those whose acts may fairly be said to represent official policy," *Owen v. City of Independence,* 589 F.2d 335, 337 (8th Cir.1978), to preclude a grant of summary judgment on this ground.

■ The district court also appeared to base its grant of summary judgment on its findings that the city manager's actions "had no detrimental effect on Westborough Mall's development in light of the Mall's prior history and potential by April, 1979," and that there was "no evidence of a link between the acts of either [the city defendants or the West Park Mall developers] to

damages suffered by plaintiffs." As the district court correctly noted, the plaintiffs owed money to the Penzel Construction Company and to the Bank of New Madrid, had been unsuccessful in securing anchor tenants and had not yet filed an application for the financing necessary to develop the Westborough Mall when the city announced in April, 1979, that the plaintiffs' C–4 zoning had reverted to residential and manufacturing classifications.

We agree with the plaintiffs, however, that the district court failed to view the evidence in a light most favorable to them when it concluded as a matter of law that the plaintiffs' interests were in no way damaged by defendants' actions. The district court, in essence, held that the evidence compelled the conclusion that the Westborough Mall failed because of plaintiffs' poor business skills. In making this judgment, the court made "a choice of inferences to be drawn from the subsidiary facts" presented by both parties, *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), a choice which is impermissible on a motion for summary judgment.

Our review of the record leads us to conclude that there is a genuine issue of material fact as to the viability of plaintiffs' development. Staples' testimony,[5] Green's testimony and documents produced by the defendants could reasonably support the conclusion that the Westborough Mall failed to attract major tenants and to obtain further financing because the land lost its C–4 designation at the same time that a competitor—defendants' West Park Mall development—was granted the required zoning to develop a regional shopping facility. The plaintiffs had invested over $1 million in the Westborough Mall project; site preparations had been made and letters of interest had been received. The defend-

ants viewed plaintiffs' progress as a potential threat to their plans. Moreover, there is evidence that temporary financing could perhaps have been obtained to construct the Westborough Mall shell, even without an anchor tenant committed to the project, had plaintiffs been given the opportunity to develop the "Elite" store concept. The plaintiffs' financier halted his efforts to obtain such financing after the zoning controversy developed.

Before the reverter in April of 1979, the plaintiffs had a valuable leasehold interest in the only land in Cape Girardeau that was zoned for an integrated shopping center and on which site improvements had already been made. Assuming Cape Girardeau is a "one shopping mall town," this interest should have been marketable, yet the evidence suggests that the plaintiffs may have been unable to sell their leasehold after the announcement of the reversion, as a result of the "cloud" that had been placed over the status of the zoning of their property. The plaintiffs have thus presented facts that they were damaged by the application of the reverter to their property through September, 1980, when the council enacted ordinance 1599 reaffirming their entitlement to the C–4 classification. We therefore find that the district court erred in concluding as a matter of law that the plaintiffs were not damaged in any way by the reverter, and accordingly we hold the court erred in granting summary judgment on Count 1 of plaintiffs' complaint.

## II.

Counts 2 through 4 of plaintiffs' complaint contain various allegations of a conspiracy between the city defendants and the West Park Mall developers regarding the reverter of plaintiffs' C–4 zoning and the grant of C–2 and then C–4 zoning to the private defendants: Count 2 alleges a con-

---

**5.** The defendants characterize Staples' testimony as "self-serving and conclusory opinions and conjecture," which they argue cannot serve as a basis for denying summary judgment. Unlike the situations presented in the cases cited by the defendants, *see, e.g., Pan-Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d

539, 556–557 (5th Cir.1980), *cert. denied,* 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981); *Thornhill Publishing Co. v. General Telephone & Electronics Corp.,* 594 F.2d 730, 738 (9th Cir.1979), there are specific facts which support the plaintiffs' view of the effect of the reverter, however.

spiracy between the city and the West Park Mall developers to deprive the plaintiffs of their constitutional rights; Count 3 alleges a conspiracy among all the defendants to restrain trade in violation of section 1 of the Sherman Act; and Count 4 alleges a conspiracy to monopolize the shopping center market in violation of section 2 of the Sherman Act. In granting summary judgment on these claims, the district court stated that the "plaintiffs have been unable to unearth a shred of evidence linking an improper act of the City defendants to the private developers' efforts to build West Park Mall."

■ The plaintiffs concede that "the evidence of conspiracy is not direct and overwhelming," and we agree with this statement. Nonetheless, the elements of a conspiracy are rarely established through means other than circumstantial evidence, *see, e.g., Crowe v. Lucas,* 595 F.2d 985, 993 (5th Cir.1979), *cert. denied,* 102 S.Ct. 1251 (1982), and summary judgment is only warranted when "the evidence is so one-sided as to leave no room for any reasonable difference of opinion as to how the case should be decided." *Admiral Theatre Corp. v. Douglas Theatre Corp.,* 585 F.2d 877, 883 (8th Cir.1978) (citations omitted). The court must be convinced that the evidence presented is insufficient to support any reasonable inference of a conspiracy. *Id.* at 884. *See Poller v. Columbia Broadcasting System,* 368 U.S. 464, 472–473, 82 S.Ct. 486, 490–491, 7 L.Ed.2d 458 (1962).

■ Our review of the record in view of these standards convinces us that the district court erred in its conclusion that there was *no* evidence of a conspiracy between the city officials and the May-Drury defendants.

In order to establish a cause of action based upon a conspiracy in this case, the plaintiffs had to show with at least circumstantial evidence that the private developers made a deal with the city or with at least some of the city officials whereby the city would act to stop plaintiffs' Westborough Mall by casting doubt upon the status of their zoning long enough to allow the

defendants' West Park Mall to secure tenants and to obtain a sufficient "head start" on construction. The circumstantial evidence of such an illegal agreement consists of the close relationship between defendant Drury and city officials, the defendants' concern about the progress of plaintiffs' competing site, Drury's notes to "stop them from building so maybe we get a chance to build," and the timing of the reverter of plaintiffs' C–4 zoning only two days after the city council enacted an ordinance that allowed the West Park Mall developers to begin construction.

Defendant Drury has filed an affidavit stating that no Drury defendants "knew in advance about, participated in, or contributed to Mr. Lawley's opinion" regarding the C–4 reversion, and Lawley has denied the existence of any agreement to assist the West Park Mall developers by taking plaintiffs' zoning from them, but we find there is sufficient evidence of a possible conspiracy to illegally revert plaintiffs' zoning to withstand a motion for summary judgment.

The preferential treatment accorded Drury by city officials is illustrated by the facts concerning the West Park Mall zoning. Drury was confident that zoning would not present a problem for his development plans at a very early date, even though the plaintiffs had obtained a C–4 classification and the defendants believed that Cape Girardeau could only support one shopping mall facility. Drury was allowed to proceed under a C–2 classification, while the plaintiffs were advised that a C–4 zone was required. Drury's feeling that the West Park Mall was "desired by the powers that be" suggests that he had struck an agreement with city officials that would ensure his mall's success. Although proof of private meetings with city officials may not be sufficient evidence of any improper arrangements, Drury's involvement with city officials went beyond such meetings: Drury obtained a "tacit" agreement for C–4 zoning prior to any city council action concerning either the C–2 or C–4 zoning changes that he requested, he wrote most of the city manager's report to the city council con-

cerning his rezoning request, and he referred to his zoning application plans as "C–2 per Lawley schedule."

We wish to emphasize that this preferential treatment alone would not be grounds for a cause of action by the plaintiffs: the relationship between the city and Drury is, however, evidence from which a trier of fact could infer the existence of a conspiracy to deprive the plaintiffs of their zoning rights.

Other circumstantial evidence of an illegal agreement to revert the plaintiffs' C–4 zoning includes the defendants' desire to stop plaintiffs' development, or at least slow it down, so that West Park Mall could be brought to a stage where it could effectively overcome competition by the plaintiffs. Prior to the reverter announcement, the record shows that the May-Drury defendants considered the Westborough Mall to be a "competing site"—indeed, they concede there is no inherent advantage to their location over that of the plaintiffs. They acted to secure anchor tenants as quickly as possible when it appeared that the plaintiffs might be in a position to sign such tenants. The plaintiffs had begun site preparations and had obtained both the required zoning and a building permit from the city when Drury's notes in February, 1979, state "stop them from building so we maybe get a chance to build."

The May-Drury defendants do not deny that the reversion of plaintiffs' zoning was of great benefit to them. Only days after the reverter was announced, they told J.C. Penney officials, who had doubted Drury's ability to obtain council approval for another C–4 district in the City of Cape Girardeau, that the reverter would effectively preclude any development of the Westborough Mall until the status of plaintiffs' zoning was resolved in court.

Finally, the timing of the reverter supports an inference of a conspiracy to delay plaintiffs' project by reverting their C–4 zoning. Ordinance 904, enacted in 1974, granted the plaintiffs a C–4 classification and specifically stated that the grant was exempt from the requirement of the city's reverter ordinance. Yet, in 1979, two days after the defendants obtained C–2 zoning on all of their property, and two years after the automatic reverter would have gone into effect, the city manager reviewed the Westborough file, missed the explicit reference to the exemption, forgot about its existence even though he was the city manager at the time the ordinance was enacted, and announced that, in his opinion, the plaintiffs' C–4 zoning had reverted to its prior classification.

It is true that no city official appears to have a direct financial interest in the West Park Mall, but Drury's association with the May defendants may have allowed him to offer the city a Famous Barr store if the West Park Mall were allowed to develop according to Drury's plans, which the plaintiffs in effect could not.[6] Or, perhaps the city was interested in Drury's right-of-way, which he may have offered the city in exchange for the "tacit" agreement for a C–4 district in September, 1978.

Under all of these circumstances, giving the plaintiffs the benefit of the reasonable inferences that may be derived therefrom, we believe the district court erred in concluding as a matter of law that no conspiracy existed. The inference that defendant city officials and the West Park Mall developers conspired to deprive the plaintiffs of their legal right to C–4 zoning and to block their development plans is not an irrational one. Although the facts in support of such a conspiracy are not conclusive, they also are not "meaningless," as the defendants contend.

---

6. Famous Barr is a subsidiary of the May Company. In a February 14, 1979, phone conversation with a May official regarding Drury's strategy to obtain the required zoning changes for the West Park Mall, Drury stated, "[w]e'll have to talk to these people quietly—we can't bring this out in the open meeting, but * * * if we have to, we'll produce the letter from Famous saying * * * this is the only site in Cape Girardeau that they will * * * [locate in]." While this conduct alone is not illegal, it is evidence from which a trier of fact could infer an illegal agreement with the city to revert the plaintiffs' zoning.

In sum, our review of the facts presented thus far convinces us that the defendants were not entitled to a summary judgment in their favor under section 1983 or under sections 1 or 2 of the Sherman Act. Although the record is not fully developed, we believe the district court erred in granting summary judgment on the grounds that there was no official action by the city regarding the status of plaintiffs' zoning, that there was no evidence of a conspiracy, and that there was no evidence that the actions of the defendants had a detrimental effect on the viability of the plaintiffs' project or the value of their leasehold interest. The city may be liable to the plaintiffs under section 1983 if the plaintiffs establish at trial that the city acted under color of state law to deprive them of their property rights without due process. *See generally Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–1913, 68 L.Ed.2d 420 (1981). The West Park Mall defendants may also be liable under section 1983 if the plaintiffs can prove the existence of a conspiracy with the city to deprive them of these rights.

Moreover, we cannot say at this stage that the plaintiffs' antitrust claims are wholly without merit. The plaintiffs may recover under their section 1 Sherman Act claim if they prove at trial that there was an agreement between the city officials and the West Park Mall developers which was intended to harm or unreasonably restrain trade; that as a direct result plaintiffs have been injured; and that the damages sustained are capable of reasonable ascertainment and are not speculative or conjectural. *Rosebrough Monument Co. v. Memorial Park Cemetery*, 666 F.2d 1130, 1138 (8th Cir.1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1982); *Admiral Theatre Corp. v. Douglas Theatre Co., supra*, 585 F.2d at 883–884. The defendants may also be liable under section 2 of the Sherman Act for a conspiracy to monopolize the shopping center market if the plaintiffs can establish: (1) the existence of a conspiracy, (2) overt acts in furtherance of the conspiracy, (3) a substantial amount of commerce, and (4) a specific intent to monopolize.[7] *See generally* 2 Von Kalinowski, Antitrust Laws and Trade Regulation, § 6.01[1] & [3] (1982); 3 *id.*, § 7.01.

The defendants assert that even if the plaintiffs successfully prove all the elements of a section 1983 or an antitrust violation, the district court's grant of summary judgment should be upheld because all the defendants were protected from liability under the *Noerr-Pennington* and *Parker v. Brown* doctrines. We disagree. The *Noerr-Pennington* doctrine exempts from the antitrust laws lobbying and other joint efforts by private individuals to obtain legislative or executive action. *See United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). *See generally* 7 Von Kalinowski, Antitrust Laws and

---

7. Count 6 of plaintiffs' complaint also alleged an illegal monopoly in violation of section 2 of the Sherman Act. Assuming arguendo that the regional shopping center market in Cape Girardeau is the relevant market for antitrust purposes and that Cape Girardeau would only support one shopping center, the defendants argue that the plaintiffs' monopolization claim must fail as a matter of law because the West Park Mall defendants are "natural monopolists" who succeeded through fair competition. These defendants boldly assert that they "succeeded simply because they knew what they were doing and plaintiffs failed because they didn't." We rejected the district court's conclusion to this effect above. When the facts are viewed in a light most favorable to the plaintiffs, there is evidence to support the inference that the defendants achieved their "monopoly" through "exclusionary, unfair, or predatory means." *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 991 (D.C.Cir.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). *See Superturf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1277, 1279 (8th Cir.1981). While "a natural monopoly market does not of itself impose restrictions on one who actively, but fairly, competes for it," in this case there is an "affirmative showing of conduct from which a wrongful intent can be inferred." *Union Leader Corp. v. Newspapers of New England, Inc.*, 284 F.2d 582, 584 (1st Cir.1960), *cert. denied*, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961) (citations omitted). Hence, the district court erred in granting summary judgment against the plaintiffs on their illegal monopolization claim.

Trade Regulation *supra,* § 46.04. This exemption is based upon the First Amendment and hence extends to any legitimate use of the political process by private individuals, even if their intent is to eliminate competition. *United Mine Workers v. Pennington, supra,* 381 U.S. at 670, 85 S.Ct. at 1593. The plaintiffs argue the *Noerr* exemption does not apply in this case because government officials are alleged participants in the conspiracy. *See Duke & Co. v. Foerster,* 521 F.2d 1277, 1281–1283 (3d Cir. 1975). This coconspirator exception has been criticized, however, *see, e.g., Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220, 229–230 (7th Cir.1975), and we decline to base our decision on the presence of the government as a defendant herein.

 Rather, we find that the defendants may not be protected by *Noerr* because their legitimate lobbying efforts may have been accompanied by illegal or fraudulent actions. *See Sacramento Coca-Cola Bottling Co. v. Chauffeurs, Teamsters & Helpers Local 150,* 440 F.2d 1096, 1099 (9th Cir.), *cert. denied,* 404 U.S. 826, 92 S.Ct. 57, 30 L.Ed.2d 54 (1971); *Woods Exploration & Producing Co. v. Aluminum Co. of America,* 438 F.2d 1286, 1296–1298 (5th Cir. 1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). The *Noerr-Pennington* doctrine was not "intended to protect those who employ illegal means to influence their representatives in government." *Sacramento Coca-Cola Bottling Co. v. Chauffeurs, Teamsters & Helpers Local 150, supra,* 440 F.2d at 1099. *See generally* 7 Von Kalinowski, Antitrust Laws and Trade Regulation, *supra,* § 46.04[3] at 46–55. In *Gorman Towers, Inc. v. Bogoslavsky, supra,* we recognized that actions beyond "traditional political activity" may not be protected by the *Noerr* exemption. *Id.,* 626 F.2d at 615. Because the plaintiffs have presented facts that support an inference of unlawful conduct—city officials may have been induced by the May-Drury defendants by means other than legitimate lobbying to illegally revert plaintiffs' C–4

zoning—the *Noerr* doctrine may not be relied upon to support the district court's grant of summary judgment. *See Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n,* 663 F.2d 253, 266 (D.C.Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982).

 We also disagree with the district court's holding that the state action exemption established in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), precludes any liability by the defendants as a matter of law. *Parker* immunity is intended to exempt from the antitrust laws state actions that are anticompetitive in nature. "[W]here a restraint upon trade or monopolization is the result of valid governmental action * * * no violation of the [Sherman] Act can be made out." *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., supra,* 365 U.S. at 136, 81 S.Ct. at 529. The *Parker* doctrine applies to municipal action "in furtherance or implementation of clearly articulated and affirmatively expressed state policy." *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 52, 102 S.Ct. 835, 841, 70 L.Ed.2d 810 (1982). Even if zoning in general can be characterized as "state action," *see Sound, Inc. v. American Telephone & Telegraph Co.,* 631 F.2d 1324, 1334 (8th Cir.1980) (factors relevant to determining "state action"), a conspiracy to thwart normal zoning procedures and to directly injure the plaintiffs by illegally depriving them of their property is not in furtherance of any clearly articulated state policy. *See Stauffer v. Town of Grand Lake,* 1981–1 CCH Trade Cases ¶ 64,029 at 76,330 (D.Colo., October 9, 1980); *Mason City Center Associates v. City of Mason City,* 468 F.Supp. 737, 741–744 (N.D.Iowa 1979). *See also Guthrie v. Genesee County,* 494 F.Supp. 950, 955–958 (W.D.N.Y.1980).

### III.

 Finally, we must address plaintiffs' contentions that the district court erred in

granting summary judgment against them on their state law claims: Count 5, which alleged a conspiracy to interfere with plaintiffs' valid business relationships and contract rights; and Count 7, which challenged the ordinances granting C–2 and C–4 zoning to the defendants. The district court dismissed Count 5 by holding that the efforts of the West Park Mall developers were legitimate business activities and that plaintiffs' mall failed because of their poor business skills, not because of any actions by the defendants. Because of our finding that the district court erred in making these conclusions as a matter of law, we also reverse the grant of summary judgment as to Count 5 of plaintiffs' complaint. We believe there are genuine issues of material fact as to whether the defendants illegally conspired to thwart plaintiffs' efforts to develop Westborough Mall and whether the reversion of plaintiffs' C–4 zoning caused the plaintiffs' development to fail. As we have previously stated, we decline to apply the *Noerr-Pennington* doctrine under the circumstances of the present case, and, therefore, reject defendants' argument that it supplies an alternative ground for upholding the district court's grant of summary judgment on this count. *Cf. First National Bank v. Marquette National Bank,* 482 F.Supp. 514, 524–525 (D.Minn.1979), *aff'd,* 656 F.2d 191 (8th Cir.1980), *cert. denied,* 450 U.S. 1042, 101 S.Ct. 1761, 68 L.Ed.2d 240 (1981) (*Noerr-Pennington* doctrine protects the defendants from liability on tortious interference claim "to the extent that plaintiffs' claims are based upon lobbying and litigation activities [and] there are no genuine issues as to any material facts").

Count 7 of plaintiffs' complaint challenged the reasonableness of the rezoning of the West Park Mall. The district court held that the plaintiffs had no standing to challenge the change in defendants' zoning and in any case found ordinances 1437 and 1369 to be valid. We affirm the district court's grant of summary judgment on this count because we agree that the plaintiffs lack standing under state law to object to the ordinances at issue.

Missouri law currently provides that in order to have standing, the plaintiffs must be aggrieved parties—that is, they "must demonstrate a specific and legally cognizable interest in the subject matter of the [challenged] decision and that [they have] been directly and substantially affected thereby." *Palmer v. St. Louis County,* 591 S.W.2d 39, 41 (Mo.App.1979) (citations omitted). *See* Mo.Rev.Stat. § 89.-110. Competitive disadvantage alone does not give rise to standing, *Schmitt v. City of Hazelwood,* 487 S.W.2d 882, 888 (Mo.App. 1972), and although plaintiffs' leasehold is less than one mile from the West Park Mall, they have failed to demonstrate how the city's rezoning of defendant's property—apart from the reversion of plaintiffs' C–4 zoning—affects a protectable interest of the plaintiffs beyond mere competitive disadvantage. *See Palmer v. St. Louis County, supra,* 591 S.W.2d at 41. The plaintiffs' land is not directly adjacent, contiguous to, or within sight of defendants' land. *See, e.g., Schweig v. City of St. Louis,* 569 S.W.2d 215, 220–221 (Mo.App.1978) (and cases cited therein).

The harm allegedly suffered by the plaintiffs as a result of the city defendants' actions occurred because of the reversion of *their* C–4 zoning. Although the fact that defendants' property was rezoned is related to the damage to plaintiffs' interests, the rezoning *alone* would not have caused any special injury to them other than affording them competition. Thus, we affirm the district court's grant of summary judgment in favor of all defendants on Count 7 of plaintiffs' complaint.[8] Because we agree that

---

**8.** It has been suggested that Missouri law on the issue of standing may be undergoing some change. If any such change occurs prior to the entry of final judgment by the district court, the court is free to reconsider its decision that plaintiffs lack standing in view of the new developments in state law.

the plaintiffs lack standing under current state law, we need not consider the district court's rulings on the substantive issues raised by the plaintiffs.

## IV.

In conclusion, we reverse the district court's grant of summary judgment in favor of the city and the private defendants on Counts 1 through 6 of plaintiffs' complaint.[9] The district court, in holding that the plaintiffs were not entitled to judgment on these claims as a matter of law, weighed the evidence presented without giving the plaintiffs the benefit of the reasonable inferences that could be made from the facts presented; genuine issues of material fact preclude summary disposal of these counts. The district court correctly held that the plaintiffs lack standing to challenge the West Park Mall rezoning under current state law and we, therefore, affirm the grant of summary judgment in favor of all defendants on Count 7 of plaintiffs' complaint.

9. We affirm the district court's grant of summary judgment in favor of the individual city officials. See *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607, 613–614 (8th Cir.1980).