The CITY AND COUNTY OF DENVER; the City Council of the City and County of Denver, by its council members (not as individuals, but as members of the City Council), T.J. Hackworth, M.L. Sandos, Stephanie A. Foote, Paul L. Swalm, John J. Silchia, Nieves Perez McIntire, Hiawatha Davis, Jr., Salvadore Carpio, Cathy Donohue, William R. Roberts, Robert L. Crider, Cathy Reynolds, William A. Scheitler, the Denver Urban Renewal Authority; Federico Pena, as Mayor of the City and County of Denver; Thomas P. Briggs, Manager of Revenue of the City and County of Denver and Ex Officio Treasurer and Assessor of the City and County of Denver; Felicia Muftic, City Clerk of the City and County of Denver; BCE Development Properties, Inc.; and Freida Marin, Public Trustee, Petitioners,

v.

BLOCK 173 ASSOCIATES, a Colorado general partnership, Donald Oberndorf; Leo Stern; Harry Paul Wertheimer; Carol Brodie, Administrator for the Edith O. Wertheimer Trust; and Dottie Hammell, Respondents.

No. 90SC382.

Supreme Court of Colorado, En Banc.

July 9, 1991.

Opperman & Associates, P.C., Marlin D. Opperman, William M. Schell, Linda A. Surbaugh, Denver, for Denver Urban Renewal Authority.

Davis, Graham & Stubbs, Dale R. Harris, David R. Hammond, Lisa S. Kahn, Denver, for petitioner BCE Development Properties.

Patricia L. Wells, City Atty., Robert M. Kelly, Donald E. Wilson, Karen A. Aviles, Asst. City Attys., Denver, for petitioners the City and County of Denver; the City Council of the City and County of Denver, by its council members (not as individuals, but as members of the City Council), T.J. Hackworth, M.L. Sandos, Stephanie A. Foote, Paul L. Swalm, John J. Silchia, Nieves Perez McIntire, Hiawatha Davis, Jr., Salvadore Carpio, Cathy Donohue, William R. Roberts, Robert L. Crider, Cathy Reynolds, William A. Scheitler; Federico Pena, as Mayor of the City and County of Denver; Thomas P. Briggs, Manager of Revenue of the City and County of Denver and Ex Officio Treasurer and Assessor of the City and County of Denver; Felicia Muftic, City Clerk of the City and County of Denver; and Freida Marin, Public Trustee.

Baker & Hostetler, James A. Clark, Bruce D. Pringle, Joan B. Burleson, Denver, for respondent Block 173 Associates.

Justice ERICKSON delivered the Opinion of the Court.

We granted certiorari to review the opinion of the Colorado Court of Appeals, *Block 173 Associates v. City & County of Denver*, 797 P.2d 771 (Colo.App.1990). The issue is whether *res judicata* or collateral estoppel operates to bar the trial of the plaintiff's, Block 173 Associates (landowner), claims in state court. The landowner's state claims contested an urban renewal plan adopted by the defendants, which included the condemnation of the landowner's property in downtown Denver, Colorado. A companion case, alleging the same underlying facts, was filed by the landowner in federal district court. The federal district court resolved the issues by granting the defendants' motion for summary judgment. *Oberndorf v. City & County of Denver*, 696 F.Supp. 552 (D.Colo.1988). That decision was appealed and affirmed by the Tenth Circuit, 900 F.2d 1434 (10th Cir.1990), and certiorari was denied by the United States Supreme Court. *Block 173 Assoc. v. City & County of Denver*, — U.S. —, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990).

The Denver District Court, on the basis of the federal decisions in *Oberndorf*, granted the defendants' motion for summary judgment in the companion state cases. The Colorado Court of Appeals par-

tially reversed the district court's determination that *res judicata* and collateral estoppel barred the landowner's state claims, and held that two of the landowner's state claims were not barred by virtue of the federal district court summary judgment. We affirm the court of appeals.

This case arises out of the City of Denver's attempt to promote in the construction and development of a three-block retail complex in downtown Denver known as Centerstone. Block 173 Associates and Donald Oberndorf owned, either alone or as tenants-in-common with BCE Development Properties, Inc. (BCED), three blocks in downtown Denver proposed for Centerstone, which were included within a fifteen-block area that the Denver City Council determined to be blighted for purposes of urban renewal. The defendants were the City of Denver, the Denver City Council, the mayor of Denver, the Denver Urban Renewal Authority (DURA), Denver's manager of revenue, the Denver city clerk, BCED, and the public trustee for the City of Denver.[1]

In 1983, Denver and the Denver Partnership, Inc., a civic and downtown business nonprofit organization, formed the Sixteenth Street Retail Development Task Force to assist in forming a public and private partnership to develop a multi-block retail project on the Sixteenth Street Mall. Although multiple bids were solicited, only BCED showed both the interest and capacity to proceed with the project. BCED proposed the three-block Centerstone project, to be built in part on blocks 173 and 196, which were not blighted. The municipal defendants and BCED concluded Center-

stone was only economically viable if public funding was available. BCED proposed tax increment financing, a form of public funding that allows for the sale of municipal bonds to raise money for public improvements pursuant to the Colorado Urban Renewal Law, sections 31–25–101 to –115, 12B C.R.S. (1986 & 1989 Supp.). It is undisputed that BCED would benefit from the financing made available by the city and the development of the Centerstone project. In 1984, the city began to take steps to adopt an urban renewal plan.

Section 31–25–107(1) provides that no urban renewal project shall be undertaken unless the appropriate authority, in this case the Denver City Council, finds that the area is blighted or a slum. In early 1985, the city council funded a DURA study of a fifteen-block area, including the three blocks proposed for Centerstone, to determine whether that area was blighted, and employed HOH Associates, Inc., a consulting, economic analysis, and landscape architectural firm, as the expert to conduct the "blight survey." In March 1986, HOH Associates submitted a written report to DURA. In the opinion of HOH Associates, as set forth in the report, the "Downtown Study Area ... is a Blighted Area in accordance with the criteria established in Section 31–25–103(2) of the Colorado Revised Statutes."[2] HOH Associates was also of the opinion, however, that the three blocks specifically targeted for Centerstone were not blighted within the meaning of the statute. Based on the HOH Associates' study, DURA developed an urban renewal plan that included Centerstone, and

**1.** The landowners (Block 173 Associates and Oberndorf) filed separate state and federal claims. The court of appeals, however, held that all Oberndorf claims were disposed of by the federal court decision, and, because no cross-petition for certiorari was filed, that decision is not before us. The issue before us, then, involves only the two Block 173 Associates' claims preserved by the court of appeals.

**2.** Section 31–25–103(2) provides:
   (2) "Blighted area" means an area which, by reason of the presence of a substantial number of slum, deteriorated, or deteriorating structures, predominance of defective or

inadequate street layout, faulty lot layout in relation to size, adequacy, accessibility, or usefulness, unsanitary or unsafe conditions, deterioration of site or other improvements, unusual topography, defective or unusual conditions of title rendering the title non-marketable, or the existence of conditions which endanger life or property by fire and other causes, or any combination of such factors, substantially impairs or arrests the sound growth of the municipality, retards the provision of housing accommodations or constitutes an economic or social liability, and is. a menace to the public health, safety, morals, or welfare in its present condition and use.

which, under the Urban Renewal Law, included the right of condemnation. § 31–25–105(e).

On May 27, 1986, the city council considered the proposed urban renewal plan at a public hearing. The landowner appeared at the meeting and opposed the plan, disputing that the area was blighted. At the conclusion of the meeting, the council voted 9–2 to adopt the plan for the entire fifteen-block area. In August 1987, DURA solicited proposals from prospective developers for redevelopment of all or part of the fifteen-block urban renewal area. BCED submitted the only proposal for Centerstone. BCED's proposal was accepted and the Centerstone project was to be Phase I of the urban renewal plan. The landowner subsequently filed actions contesting the redevelopment plan in both state and federal court.

The federal complaint included allegations that the plan violated federal antitrust laws, the federal Constitution, and the landowner's civil rights in violation of 42 U.S.C. § 1983. The state complaint set forth virtually identical allegations of facts. The state action included C.R.C.P. 106 claims alleging that the defendants exceeded their jurisdiction under color of quasi-judicial authority. The landowner also sought damages and an injunction, claiming the urban renewal plan was a sham. The landowner claimed that the city council had acted in excess of its authority under the Urban Renewal Law, and the defendants had conspired to take property for private purposes. The landowner also asserted various state and federal constitutional claims.[3]

After the defendants obtained summary judgment in federal court, an identical motion for summary judgment was made in the state court proceeding. The Denver District Court found that all of the issues were resolved by the federal court and granted summary judgment for the defendants. The Colorado Court of Appeals affirmed with the exception of what it termed the "bad faith" claims, and held that those claims were not affected by the federal decision. 797 P.2d at 773–74. The court of appeals preserved the sixth and eighth state claims for relief to permit the landowner to provide proof that there was a genuine issue of material fact regarding the claims of fraud and bad faith. The court of appeals opinion foreclosed the granting of summary judgment on the basis of *res judicata* and collateral estoppel, and casts the burden of establishing a genuine issue of bad faith or fraud on the landowner.

I

The requirement that the city council make a finding that the area in question is blighted or a slum is a prerequisite to adoption of an urban renewal plan. § 31–25–107(1). For purposes of judicial review, that statutory requirement is the equivalent of "necessity" in other condemnation cases.[4] *Cf.* § 31–25–104(1)(b), 12B C.R.S. (1986) (In order to establish an urban renewal authority, the governing body must find that "one or more slum or blighted areas exist in the municipality, and [find] that the acquisition, ... [and] development ... of such area is necessary in the interest of the public health, safety, morals, or welfare of the residents of the municipality....").

In examining the stated public purpose for a condemnation, we look to whether the stated public purpose is sup-

---

**3.** Shortly after the two cases were filed, and after discovery in the federal case commenced, the Denver district court ordered a stay of the state case. On a motion for reconsideration, the landowner argued that the stay should remain in effect because the issues and claims in both cases were identical. *See* transcript of November 26, 1986, hearing (R. III). Over the defendants' objections, the district court preserved the stay.

The landowner now argues that, while a federal district court decision actually resolving this case on the merits would have barred the state claims, the federal resolution by means of summary judgment does not.

**4.** The fact that the three blocks dedicated to Centerstone were not blighted did not prevent those blocks from being included in the urban renewal plan. *See Rabinoff v. District Court,* 145 Colo. 225, 237–38, 360 P.2d 114, 121 (1961).

ported by the record. If so, our inquiry ends. *See Slack v. City of Colorado Springs*, 655 P.2d 376, 379 (Colo.1982) (relying on substantial evidence presented at the public hearing to uphold finding of an emergency); *Interstate Trust Bldg. Co. v. Denver Urban Renewal Auth.*, 172 Colo. 427, 432, 473 P.2d 978, 981 (1970). A determination of necessity or that an area is blighted, however, is not reviewable absent a showing of bad faith or fraud. *See Thornton Dev. Auth. v. Upah*, 640 F.Supp. 1071, 1076 (D.Colo.1986); *Direct Mail Services, Inc. v. State of Colo.*, 557 F.Supp. 851 (D.Colo.1983) ("The determination of necessity is an essential part of the power of eminent domain and, once necessity is determined by legislative act, no further finding or adjudication is required."), *aff'd*, 729 F.2d 672 (10th Cir.1984); *City of Thornton v. Farmers Reservoir & Irrigation Co.*, 194 Colo. 526, 535, 575 P.2d 382, 390 (1978); *Arizona–Colorado Land & Cattle Co. v. District Court*, 182 Colo. 44, 47, 511 P.2d 23, 24 (1973) ("a determination as to the location of a public improvement can be disturbed by the courts if there is fraud or bad faith by the corporation seeking to condemn."); *Colorado State Bd. of Land Comm'rs v. District Court*, 163 Colo. 338, 342, 430 P.2d 617, 619 (1967); *Dallasta v. Department of Highways*, 153 Colo. 519, 387 P.2d 25 (1963); *see also Denver West Metro. Dist. v. Geudner*, 786 P.2d 434, 436 (Colo.App.1989) ("[i]f the primary purpose underlying a condemnation decision is to advance private interests, the existence of an incidental public benefit does not prevent a court from finding 'bad faith.' "); *Tracy v. City of Boulder*, 635 P.2d 907, 909–10 (Colo.App.1981).

Some jurisdictions, when addressing claims of sham, fraud, or bad faith, have treated challenges to urban renewal plans or other condemnations as a review of the necessity for the taking. *See, e.g., Pheasant Ridge Associates, Ltd. v. Town of Burlington*, 399 Mass. 771, 775, 506 N.E.2d 1152, 1155 (1987) (when reviewing a town's condemnation of property to block the plaintiffs' attempt to obtain a permit to build low-income housing, "a municipal land taking, proper on its face, may be invalid because it was undertaken in bad faith."); *cf. Benevolent & Protective Order of Elks, Lodge No. 65 v. Planning Board of Lawrence*, 403 Mass. 531, 551–52, 531 N.E.2d 1233, 1246 (1988) (distinguishing *Pheasant Ridge* and holding that, notwithstanding some procedural deficiencies, the finding that the area was blighted was supported by the record). It may well be that the fifteen-block area surveyed by HOH Associates is blighted and would thus qualify for redevelopment under the Urban Renewal Law. The landowner's sixth and eighth claims, however, challenge whether the statutory requirements of the Urban Renewal Law are met when Centerstone is the only project approved for the urban renewal plan and the city allegedly condemns unblighted land to benefit a private developer.

■ Under section 31–25–103(10), an urban renewal project is defined as "undertakings and activities in an urban renewal area *for the elimination and for the prevention of the development or spread of slums and blight.*" (Emphasis added.) Thus, under the plain wording of the Urban Renewal Law, if the actual purpose behind a particular urban renewal plan is not the elimination or prevention of blight or slums, the urban renewal authority does not have the power to condemn land in furtherance of that plan because the determination of necessity is not supported by the record. The landowner's bad faith and fraud claims do not allege a procedural defect in the adoption of the plan, but assert that, although the defendants have met the procedural requirements of the Urban Renewal Law, the plan they adopted failed to fall within the statutory guidelines for a valid urban renewal project.[5] In the state complaint, the landowner declared in the sixth claim:

> 40. The sole purpose for the actions of defendants . . . was to provide a means

---

**5.** In its brief before this court, the landowner admits the "[d]efendants were certainly clever enough to follow the procedural requirements of the statute they chose to achieve their purposes."

by which BCE could acquire Block 173 and certain other properties located within the Centerstone blocks for purposes of developing the Centerstone project.

41. Because the Centerstone blocks, in and of themselves, did not meet the definition of a "blighted area" under CRS 31–25–103, defendants directed HOH Associates, Inc. to prepare a blight survey for a 15–block area. In addition, the Plan ... purports to deal with a 15–block area. *However, it was never the intent of the defendants to undertake an urban renewal project with respect to said 15–block area.*

42. Exhibits A and B are shams and subterfuges, prepared, promulgated, and enacted in bad faith, and having the purpose and effect of (a) *subverting the letter and spirit of the Colorado Urban Renewal Law; and (b) allowing the defendants, under the guise of the Urban Renewal Law, to acquire private property which is not blighted, and which does not otherwise come within the scope of CRS 31–25–101 et. seq. As a result, the actions of the defendants ... are in excess of any jurisdiction or authority conferred upon them by CRS 31–25–101, and are null, void, and of no force or effect.*[6]

(Emphasis added.) The eighth claim stated that the defendants entered into a conspiracy to acquire the landowner's property for private purposes, and that the means used for the conspiracy "was to adopt a sham urban renewal plan."

■ We are not required to decide how far a court may go in looking beyond a stated public purpose when bad faith is alleged. Because the proper purpose for which a condemnation action may be instituted in Colorado in the context of urban renewal is limited to plans adopted to remedy identified slum or blight conditions, the fact that such conditions were found to exist is not dispositive if the purpose in designating a large study area and in targeting block 173 as part of that area was,

as alleged, to acquire block 173 for private purposes. The claims of the landowner may be supported by evidence demonstrating that (1) the primary purpose underlying the urban renewal project was not within the scope of action authorized under the Urban Renewal Law, and (2) the project was undertaken in bad faith or fraud as a subterfuge to achieve an improper purpose rather than the authorized purpose of urban renewal. In this case, both the federal district court and the Court of Appeals for the Tenth Circuit addressed federal issues, but did not review the fraud and bad faith claims asserted by the landowner in state court. Accordingly, on remand the landowner should be permitted to establish that the urban renewal plan for Centerstone was adopted in bad faith or was a sham and a fraud.

## II

The doctrines of *res judicata* and collateral estoppel " 'relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.' " *Salida School Dist. R-32-J v. Morrison,* 732 P.2d 1160, 1163 (Colo.1987) (quoting *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980)).

## A

■ *Res judicata* operates as a bar to a second action on the same claim as one litigated in a prior proceeding when there is a final judgment, identity of subject matter, claims for relief, and parties to the action. *State Eng'r v. Smith Cattle, Inc.,* 780 P.2d 546, 549 (Colo.1989); *City of Westminster v. Church,* 167 Colo. 1, 9, 445 P.2d 52, 55 (1968); 1B *Moore's Federal Practice,* ¶ 0.410[1] (2d ed. 1991). *Res judicata* not only bars issues actually decided, but also any issues that should have been raised in the first proceeding but were not. *Pomeroy v. Waitkus,* 183 Colo. 344, 350, 517 P.2d 396, 399 (1973).

---

**6.** Exhibit A is the urban renewal plan dated May 13, 1986; Exhibit B is the underlying ordinance adopted by the city authorizing the plan.

■ Both the landowner's state and federal complaints arise from the same transaction and allege the same underlying facts. The two actions, however, are necessarily based on different claims for relief. Although normally a resolution on the merits of one claim for relief would operate to bar any other claims for relief that could have been brought in the first proceeding, in this case the landowner could only have asserted the state claims in federal court as pendent to the federal claims for relief. When a federal claim is dismissed on a motion for summary judgment, federal courts have consistently held that "a sound exercise of discretion requires dismissal of the state claims as well without prejudice to [the] plaintiffs' right to litigate them in the proper state forum." *Ron Tonkin Gran Turismo v. Wakehouse Motors, Inc.*, 46 Or.App. 199, 205, 611 P.2d 658, 661 (1980) (citing *Hodge v. Mountain States Tel. & Tel. Co.*, 555 F.2d 254 (9th Cir.1977)); *Ouzts v. Maryland Nat'l Ins. Co.*, 470 F.2d 790 (9th Cir.1972), *modified*, 505 F.2d 547 (9th Cir.1974), *cert. denied*, 421 U.S. 949, 95 S.Ct. 1681, 44 L.Ed.2d 103 (1975); *Wham–O Mfg. Co. v. Paradise Mfg. Co.*, 327 F.2d 748 (9th Cir.1964); *see also United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Walkusch v. Board of County Comm'rs*, 627 F.Supp. 541 (D.Colo. 1986). Because the state claims were not truly "available to the parties" in the federal action, *res judicata* does not apply to bar the state action. *Brown v. Felsen*, 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979).[7]

## B

■ Collateral estoppel, however, is not so limited. Rather than claim preclusion, collateral estoppel is directed to "issue preclusion." *Pomeroy v. Waitkus*, 183 Colo. at 350, 517 P.2d at 399. "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." Restatement (Second) of Judgments § 27 (1980). Collateral estoppel is broader than *res judicata* since it applies to claims for relief different from those litigated in the first action, but narrower in that it only applies to issues actually litigated. *Industrial Comm'n v. Moffat County School Dist. RE No. 1*, 732 P.2d 616, 620 (Colo. 1987). Collateral estoppel bars relitigation of issues if (1) the issue is identical to an issue actually and necessarily adjudicated at a prior proceeding; (2) the party against whom estoppel is asserted is a party or in privity with a party in the prior proceeding; (3) there was a final judgment on the merits; and (4) the party against whom estoppel is asserted had a full and fair opportunity to litigate the issue in the prior proceeding. *Id.* at 619–20; *People ex rel. Gallagher v. District Court*, 666 P.2d 550, 554 (Colo.1983); *People v. Hearty*, 644 P.2d 302, 312 (Colo.1982); *Metropolitan Gas Repair Serv., Inc. v. Kulik*, 621 P.2d 313, 319 (Colo.1980). Collateral estoppel of the landowner's sixth and eighth claims requires that the federal district court must actually and necessarily have addressed whether the purpose of the urban renewal plan was to eliminate or prevent a slum or blight condition and found no evidence sufficient to raise a genuine issue of material fact of use of the plan to cover an improper purpose on the part of the public entities.[8]

The landowner argues that although the bad faith issue was raised in the federal case, the federal court found that any violation of state law or activity in excess of statutory authority was immaterial to resolving the dispositive federal issues. In the federal district court opinion, Judge Carrigan said that

---

7. All parties concede the constitutional claims brought in both the state and federal action have been disposed of by the federal court.

8. We are not presented with the issue of whether a genuine issue of material fact exists concerning the presence of bad faith in absence of the applicability of collateral estoppel. The state trial court ruling was predicated solely on collateral estoppel and *res judicata*.

[w]hether the defendant's actions complied exactly with every detailed provision of the Urban Renewal Law in this instance is not properly before me in the context of the federal claims asserted. That issue is appropriate for the state court to decide and appears to be before that tribunal as alleged in the plaintiff's pending lawsuits.

696 F.Supp. at 561.

In their motion for summary judgment in the federal action, the defendants claimed immunity for antitrust violations under *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and the *Noerr–Pennington* doctrine.[9] *Parker* held that state officials were immune for anticompetitive activities if those activities were directed by the state legislature. *Id.* at 350, 63 S.Ct. at 313. Municipalities and municipal officials are also immune if their conduct "is pursuant to a clearly articulated and affirmatively expressed state policy." *Hoover v. Ronwin*, 466 U.S. 558, 568–69, 104 S.Ct. 1989, 1995–96, 80 L.Ed.2d 590 (1984) (citations omitted). The *Noerr–Pennington* doctrine states that certain private actions aimed at influencing public officials are immune from antitrust rules under the first amendment.

In federal district court, the defendants claimed that *Parker* and *Noerr–Pennington* would immunize their actions if there was a valid public purpose, and the means used to achieve that purpose were lawful because they followed all procedural requirements in adopting the urban renewal plan. 696 F.Supp. at 557. The landowner disagreed, claiming that the issue was not whether the urban renewal plan had a legitimate public purpose, but rather that the defendants did "not act in a manner authorized by state statute (Colorado's Urban Renewal Law) in adopting the urban renewal plan, and that the defendants are not immune from antitrust liability." *Id.* The federal court appears to have adopted the defendants' position.

The federal district court recognized two exceptions that would defeat the immunity granted by the *Noerr–Pennington* and *Parker* doctrines, noting that these "doctrines would not immunize the defendants from acts of bribery or engaging in an illegal conspiracy." *Oberndorf,* 696 F.Supp. at 559.

The federal district court found no evidence of bribery, stating that "the [landowner] after substantial discovery, [has] not submitted any evidence indicating that any 'deal' was made, bribe taken, or other illegal act committed between the Municipal defendants and the defendant BCED with respect to the adoption or implementation of the urban renewal plan." *Oberndorf,* 696 F.Supp. at 559. This finding does not resolve whether the Urban Renewal Law was complied with. Collateral estoppel recognizes the preclusive effects of only those findings that are necessary to a final determination. *Industrial Comm'n,* 732 P.2d at 619. The finding quoted was made in the context of exceptions to the *Noerr–Pennington* doctrine. That doctrine is based in part on the first amendment and thus grants broad protection for use of the political process to influence legislation. *Noerr,* 365 U.S. at 138, 81 S.Ct. at 530; *see also, Oberndorf,* 900 F.2d at 1440; *Westborough Mall, Inc. v. City of Cape Girardeau,* 693 F.2d 733, 746 (8th Cir.1982), *cert. denied sub nom., Drury v. Westborough Mall, Inc.,* 461 U.S. 945, 103 S.Ct. 2122, 77 L.Ed.2d 1303 (1983). *Noerr–Pennington* is a grant of immunity to *private* parties engaged in efforts to influence legislative action. *Noerr,* 365 U.S. at 137, 81 S.Ct. at 529. It does not encompass alleged bad faith by the legislative body itself.

In the case of private parties, the narrow exceptions to the *Noerr–Pennington* doctrine have been applied when attempts to influence the legislature include illegal activity such as bribery or fraud in the lobbying process. *See, e.g., Westborough Mall,* 693 F.2d at 746. Thus, the finding by the federal district court pertains to the ab-

---

**9.** *Eastern R.R. President's Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of* *America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

sence of evidence of bribery and other illegal activity by the private petitioners in attempts to influence public officials. It does not encompass the allegations made in state court that the public petitioners exceeded the statutory authority to condemn property for urban renewal by having a primary purpose other than alleviation of slum or blight conditions. The federal district court's express statement that "a violation of the law, if any, does not defeat state action immunity with respect to the antitrust and conspiracy claims asserted here," *Oberndorf*, 696 F.Supp. at 560, indicates the limited inquiry by Judge Carrigan into the factual allegations underlying the landowner's state claims. *See also Oberndorf*, 900 F.2d at 1441 ("alleged violation or misuse of an urban renewal law does not constitute the kind of illegal activity which can deprive a private party of *Noerr–Pennington* protection.").

The Tenth Circuit Court of Appeals addressed the landowner's allegations of impropriety in the context of the *Parker* doctrine. *Oberndorf*, 900 F.2d at 1439. The court concluded that the federal district court addressed the allegations that the urban renewal project was a sham and found the evidence insufficient to overcome immunity granted by the *Parker* doctrine because the evidence in support of those allegations (i.e., that the Centerstone project was planned and BCED selected as the developer prior to the blight study and that the area of the blight study was artificially chosen to ensure a finding of blight) included no procedures that would "violate any statutory provision with respect to implementation of an urban renewal plan under Colorado law." *Oberndorf*, 900 F.2d at 1439 (quoting *Oberndorf*, 696 F.Supp. at 559). The standard employed by the federal court requires evidence of procedural violations or lack of state authority for the articulated public purpose of urban renewal to overcome immunity under the *Parker*

doctrine. *See City of Columbia v. Omni Outdoor Advertising*, —— U.S. ——, ——, 111 S.Ct. 1344, 1350, 113 L.Ed.2d 382 (1991) ("in order to prevent *Parker* from undermining the very interests of federalism it is designed to protect, it is necessary to adopt a concept of authority broader than what is applied to determine the legality of the municipality's action under state law"). Hence, an action that is illegal under state law may not violate federal antitrust law.

The federal standard for immunity differs, therefore, from the state standard for bad faith. The state claim of bad faith does not require evidence that the action by public officials was precipitated by illegal influence, but may be proved by establishing that the decision to act was made for reasons not authorized by the Urban Renewal Law.

The federal district court set out the factors to be examined when there are allegations of the second exception to the *Noerr–Pennington* and *Parker* doctrines —i.e., illegal conspiracy [10]—quoting the Tenth Circuit Court of Appeals' interpretation of the United States Supreme Court's holding in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597–98, 106 S.Ct. 1348, 1361–62, 89 L.Ed.2d 538 (1986):

(1) [whether] the plaintiff's evidence of conspiracy [is] ambiguous, i.e., is it as consistent with the defendants' permissible independent interests as with an illegal conspiracy; and, if so,

(2) [whether] there is any evidence that tends to exclude the possibility that the defendants were pursuing these independent interests.

*Oberndorf*, 696 F.Supp. at 559 (quoting *Gibson v. Greater Park City Co.*, 818 F.2d 722, 724 (10th Cir.1987)). The federal court then expressly found that the evidence of conspiracy was insufficient to meet the threshold to preclude dismissal, stating

**10.** The United States Supreme Court has recently refused to recognize a conspiracy or bribery exception to the *Noerr–Pennington* and *Parker* doctrines, reasoning that public entities are entitled to greater immunity than private when taking anticompetitive action for a public purpose. *City of Columbia v. Omni Outdoor Advertising,* —— U.S. ——, ——-——, 111 S.Ct. 1344, 1351-

1356, 113 L.Ed.2d 382. The Court did not go so far as to eliminate this exception for private entities or for a public entity acting as a "market participant." *Id.* at ——, 111 S.Ct. at 1353. Furthermore, that holding does not in any way undermine the findings of the federal district court that, if such an exception existed, it would not be satisfied in this case.

that "the undisputed evidence indicates that the defendants' actions were consistent with their permissible independent interests in pursuing the Centerstone Project as an effort to revitalize the downtown Denver economy." *Oberndorf,* 696 F.Supp. at 560.

Thus, the federal standard allows dismissal as long as evidence in support of a conspiracy could also be explained by the independent interests of the parties to the alleged conspiracy. In contrast, the state court summary judgment standard as applied here is whether there are genuine issues of material fact as to the existence of a conspiracy to acquire block 173 for an impermissible purpose (*see* C.R.C.P. 56(c)), an issue quite different from that addressed by the federal district court in applying *Matsushita.*[11]

Finally, both the federal district court and the court of appeals rejected that landowner's allegation of civil rights violations. *Oberndorf,* 696 F.Supp. at 560; 900 F.2d at 1441–42. The federal district court further stated that "[e]ven the presence of a conspiracy will not defeat the validity of an urban renewal plan unless the plaintiffs can show that, because of the conspiracy, no conceivable public purpose in fact exists for the urban renewal legislation." 696 F.Supp. at 560. The federal court then concluded that "the economic revitalization of the downtown Denver area constitutes a legitimate public purpose underlying the urban renewal project." *Oberndorf,* 696 F.Supp. at 561.

Thus, the basis for dismissal of the civil rights claims from federal court was not the absence of bad faith in having private interest as the *actual* or *primary* purpose in taking block 173, but that a *conceivable* public purpose exists. *See Oberndorf,* 900 F.2d at 1441 ("The Supreme Court has held [in *Parker*] that the adoption of an urban renewal plan is a legislative act which must be upheld if there is any public purpose underlying it.").

### III

Because the identity of issues necessary to invoke collateral estoppel is absent between the issues actually and necessarily decided by the federal district court and those necessary to preclude summary judgment on the sixth and eighth "bad faith" claims in state court, those findings of the district court in this case are insufficient to support summary judgment on those state claims.

Accordingly, we affirm the court of appeals holding that neither the grant of summary judgment for the defendants in federal district court, nor the Tenth Circuit Court of Appeals opinion affirming the district court ruling, bars the landowner's sixth and eighth state claims for relief on the basis of collateral estoppel or *res judicata.* We return this case to the court of appeals for remand to the district court for further proceedings consistent with this opinion.

---

**11.** The *Matsushita* standard differs from the standard applied to summary judgment motions in federal and Colorado state court: the entry of summary judgment against a party is mandated when all pleadings, affidavits, and admissions are construed in that party's favor, but the party fails to establish the existence of an element essential to the party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).