ARVADA URBAN RENEWAL AUTHOR-
ITY, a body corporate and politic of
the State of Colorado, Petitioner

v.

COLUMBINE PROFESSIONAL PLAZA
ASSOCIATION, INC.; Columbine West
Medical Office Building, Ltd., RLLLP;
Lake at CPP, LLC; Lake Front, LLC;
Parker Ojala, LLC; Public Service Com-
pany of Colorado; Swinerton Real Es-
tate, Inc.; W.S.A. Life, a/k/a W.S.A. Fra-
ternal Life; and Mark Paschall, in his
official capacity as Treasurer of Jeffer-
son County, Respondents.

No. 03SA329.

Supreme Court of Colorado,
En Banc.

March 1, 2004.

Duncan, Ostrander & Dingess, P.C., Rob-
ert R. Duncan, Donald M. Ostrander, James
Birch (Special Counsel), T. Daniel Platt (Spe-
cial Counsel), Denver, Colorado, Attorneys
for Petitioner.

Faegre & Benson LLP, Leslie A. Fields,
John R. Sperber, M. Patrick Wilson, Patrick
T. Madigan, Denver, Colorado, Attorneys
For Respondents Columbine Professional
Plaza Association, Inc.; Columbine West
Medical Office Building, Ltd., RLLLP; Lake
at CPP, LLC; Lake Front, LLC; Parker
Ojala, LLC; and Swinerton Real Estate, Inc.

Bloom Murr & Accomazzo, P.C., Joseph A. Murr, Wendy E. Weigler, Denver, Colorado, Attorneys for Respondent W.S.A. Life, a/k/a W.S.A. Fraternal Life.

No Appearance by or on behalf of Public Service Company of Colorado; and Mark Paschall, in his official capacity as Treasurer of Jefferson County.

Justice BENDER delivered the Opinion of the Court.

## I. Introduction

In this urban renewal case, we consider the scope of an urban renewal authority's condemnation power under Colorado's Urban Renewal Law, §§ 31–25–101 to –115, 9 C.R.S. (2003). In particular, we consider whether an urban renewal authority retains the power to condemn a portion of a parcel situated within an area that was determined to be blighted at the outset of an urban renewal project, even though the entire parcel has been sold by the authority, developed in accordance with its urban renewal plan, and formally released by the authority.

We hold that once a parcel within a redevelopment area has been sold, developed, and released in this manner, an urban renewal authority may not exercise its condemnation power over any part of that parcel absent renewed findings of blight by the appropriate authority. An urban renewal authority derives its power to condemn private property from our Urban Renewal Law, which authorizes condemnation of private property only to prevent or eliminate the spread of blight. Once blight has been cured or eliminated from a particular parcel, an urban renewal authority loses its statutory condemnation power with respect to that parcel. In this case, the trial court erred when it found that the parcel was still blighted and that the renewal authority retained the power to condemn it. Thus, we reverse and remand this case to the trial court with directions to grant the landowners' motion to dismiss the condemnation action.

1. The lake parcel was historically used as a gravel mining pit. After the mine was abandoned,

## II. Facts and Proceedings Below

The City of Arvada created the Arvada Urban Renewal Authority (AURA) in 1981. AURA's mandate was to oversee the redevelopment of a blighted 500–acre tract within the City of Arvada over a period of twenty-five years. The plan would thus expire in 2006. Pursuant to its mandate, AURA prepared a comprehensive plan to guide its redevelopment efforts. AURA envisioned the creation of "a mixed use urban-activity area [to] create a visually strong and attractive entranceway into the Arvada community. . . ." To this end, AURA would enlist the aid of both private and public entities to provide "commercial, office, retail, and residential development opportunities to serve the needs of the City of Arvada and the regional area."

The original redevelopment area included an eight-acre parcel containing a quarry lake.[1] This parcel was purchased by developer Crow–CISI in the mid–1980s along with a 35–acre tract that lies immediately to the west of the lake. In accordance with a plan approved by AURA, Crow–CISI built the Arvada Marketplace on the 35–acre tract. The marketplace housed four anchor stores—Sam's Club, Gart Sports, Office Depot, and Home Base—as well as several other stores and restaurants.

When Crow–CISI completed construction of the Arvada Marketplace, AURA issued Crow–CISI a "Certificate of Completion of Improvements and Renunciation of Right of Re–Entry for Condition Broken," which covered both the 35–acre Arvada Marketplace and the quarry lake parcel. AURA intended the certificate to be "a conclusive determination and satisfaction of the obligation of [Crow–CISI] to construct . . . Improvements on the Property," and included a clause confirming that "all the Improvements conform to the uses specified in the Arvada Urban Renewal Plan." AURA also surrendered its right to re-enter both properties in the following terms:

> The Authority's Rights of Re-entry for Condition Broken as reserved in the Deeds

the lake formed when the pit filled with water.

is hereby terminated as to the Property because the condition recited in the Deeds has been fulfilled as to the Property. The Authority renounces said right of Re-entry in favor of [Crow–CISI], their successors and assigns, to have and to hold the Property forever so that neither the Authority nor any of its successors in interest shall at any time hereafter have, claim, or demand any right, title or interest in or to the Property or any part thereof. . . .

After the Arvada Marketplace was completed, another developer, Parker Ojala, purchased a thirteen-acre parcel that lies immediately to the east of the quarry lake from AURA. Parker Ojala purchased this parcel for the purpose of building a high-quality office park with an adjacent lake. Around the same time, a member of the Parker Ojala group purchased the quarry lake parcel from Crow–CISI. Allan Ojala of the Parker Ojala group attended several public meetings held by AURA at which he described his plans for the office park, including the improvements he expected to add to the lake.

Parker Ojala later submitted its development plan, which included a site plan encompassing the lake, to AURA. After securing AURA's approval for the office park, Parker Ojala constructed the Columbine Professional Plaza and improved the lake property by adding walking paths, landscaping, picnic areas, and fountains. During the construction process, Parker Ojala engaged an architecture firm to prepare drawings showing how the lake property was to be integrated into the office park. One of these plans depicted the landscaping and improvements that were constructed around the lake, and this plan was approved by the City of Arvada.

When the Columbine Plaza was completed, AURA issued Parker Ojala a certificate of approval covering the office park tract. The certificate stated that the developer had satisfactorily completed the project and that "all of the improvements conform with the uses specified in the Arvada Urban Renewal Plan." The certificate also released the office park property from AURA's right of re-entry using nearly identical language to that used in the certificate issued to Crow–CISI.

Approximately three years after the office park was completed, the Arvada Marketplace lost one of its anchor stores when Home Base went bankrupt and closed its store. The Trammel Crow Company (now the manager of the Arvada Marketplace) sought new retailers to fill the empty space and eventually secured a letter of intent from Wal–Mart.

In a letter to AURA's executive director, Tim Steinhaus, Trammel Crow described the conditions of the Wal–Mart deal. Wal–Mart agreed to pay $13.5 million for the Home Base property, subject to an expected sales tax reimbursement of $7.5 million, which brought the net purchase price to $6 million. In order to accommodate the planned superstore and parking lot, several of the surrounding businesses, including the Office Depot and Gart Sports, would be required to relocate, reduce the size of their retail space, or terminate their leases. In addition, Wal–Mart would have to acquire "some portion of the adjacent Lake Property at an acceptable price."

Trammel Crow also predicted that, despite the costs associated with bringing Wal–Mart into the Arvada Marketplace, Wal–Mart would eventually prove to be a major asset to the area. In particular, Trammel Crow estimated that Wal–Mart would generate between $3 and $3.5 million in sales tax revenue for the City of Arvada each year.

Trammel Crow requested that AURA exercise its condemnation power to acquire the lake property in accordance with Wal–Mart's conditions. AURA first tried to discuss a purchase of the lake property, but when the owners refused, AURA initiated a condemnation action.

The petitioners before us, whom we refer to collectively as "Columbine," were the respondents in the trial court. They consist of owners, tenants, and other parties who possess an interest in the Columbine Office Park property. In the trial court, Columbine sought to dismiss AURA's condemnation action, arguing that AURA has no authority to condemn the lake property because the blight that originally affected the lake parcel had been eliminated or cured. The trial court rejected the motion.

The trial court found that "nothing has happened since the [1981 blight finding] to change the character of the quarry pond itself." The court did state, however, that "some very attractive amenities have been constructed all around [the lake] and it has been a great asset to [the Columbine Office Plaza]." The court also opined that Parker Ojala "built and ... utilized ... the pond very effectively." The court acknowledged the certificates of release and conceded that Columbine was probably right to argue that AURA had "abrogated [its] right to reenter." Nonetheless, the court held that these factors did not "override the simple fact in this case that the lake has never been redeveloped," and therefore concluded that the lake was blighted.

The following day at the immediate possession hearing, the trial court stated that the lake property and the office plaza were owned separately but found that the lake property "is a subservient estate and the office buildings a dominant estate." The court went on to find that the office buildings would be damaged as a result of the development of the condemned portion of the lake and awarded Columbine $190,000.00 in damages. The court granted a stay of execution for one week while Columbine sought extraordinary relief in this Court. We issued a rule to show cause and an order staying all further proceedings pending resolution of this Rule 21 petition.

For reasons we explain below, we now hold that AURA does not have the authority to condemn the lake parcel because the quarry lake is no longer blighted. Accordingly, before AURA can initiate any condemnation action with respect to the lake property, the City of Arvada must determine whether the area AURA seeks to condemn is currently blighted as that term is defined in Colorado's Urban Renewal Law. § 31–25–101 to –115, 9 C.R.S. (2003).

### III.   Analysis

Two issues must be decided in this case. The first is whether the City of Arvada's 1981 blight finding has been cured or eliminated by subsequent development of the quarry lake parcel. The second is whether,

if the blight has been cured, AURA nonetheless retains the power to condemn the quarry lake parcel pursuant to the urban renewal plan, which remains in effect until 2006. Because both of these questions are legal in nature and require construction of our Urban Renewal Law, we review the trial court's decision in this case de novo. *See Simpson v. Bijou Irrigation Co.*, 69 P.3d 50, 58 (Colo. 2003) (a trial court's interpretations of Colorado statutes or case law are reviewed de novo).

For reasons we explain below, we hold that neither the quarry lake parcel nor the shopping center is subject to the City of Arvada's 1981 blight finding. Without the support of the 1981 finding, the statutory basis underlying AURA's condemnation power over the lake parcel no longer exists. Absent renewed findings of blight on the part of the City of Arvada, then, AURA no longer has the power to exercise its condemnation powers over the quarry lake parcel.

### A.   Blight

Columbine argues the "blight" that affected the quarry lake in 1981 has been cured or eliminated by the improvements added during the construction of the office plaza. As evidence, Columbine cites the certificates of release, through which Columbine contends AURA "acknowledged that the 1981 findings of blight had been effectively eliminated and/or cured by subsequent redevelopment [of the lake property]."

In response, AURA acknowledges that it did sell the lake parcel to Crow–CISI, which in turn sold it to Parker Ojala, but maintains that the lake was never redeveloped pursuant to AURA's urban renewal plan. Thus, AURA maintains that none of the improvements added to the lake by Parker Ojala affect the City of Arvada's original blight determination or AURA's power to condemn the quarry lake pursuant to its statutory authority.

Before a municipality may create an urban renewal authority or adopt an urban renewal project, the municipality must hold a public hearing and find that a slum or blighted area

exists in the municipality.[2] *See* §§ 13–25–104(1)(a) and (b), 13–25–107(1), 9 C.R.S. (2003). *See also City and County of Denver v. Block 173 Assoc.,* 814 P.2d 824, 828 (Colo. 1991) ("The requirement that the city council make a finding that the area in question is blighted ... is a prerequisite to adoption of an urban renewal plan."). Absent a finding of blight or slum conditions, an urban renewal authority is powerless to act. *See* 11 McQuillin, *Municipal Corporations* § 32.11 (3d ed. 2000) ("The power of eminent domain, though inherent in the state ..., cannot be exercised without a legislative declaration of its objects and purposes.").

A "blighted area" is defined by statute as one that "in its present conditions and use ... substantially impairs or arrests the sound growth of the municipality ... or constitutes an economic or social liability." § 31–25–103(2), 9 C.R.S. (2003). In addition, at least four of the following factors must be present before an area can be considered blighted:

(a) Slum, deteriorated, or deteriorating structures;

(b) Predominance of defective or inadequate street layout;

(c) Faulty lot layout in relation to size, adequacy, accessibility, or usefulness;

(d) Unsanitary or unsafe conditions;

(e) Deterioration of site or other improvements;

(f) Unusual topography;

(g) Defective or unusual conditions of title rendering the title nonmarketable;

(h) The existence of conditions that endanger life or property by fire and other causes;

(i) Buildings that are unsafe or unhealthy for persons to live or work in because of building code violations, dilapidation, deterioration, defective design, physical construction, or faulty or inadequate facilities;

(j) Environmental contamination of buildings or property; [or]

(k) Inadequate public improvements or utilities."

§ 31–25–103(2)(a)–(k), 9 C.R.S. (2003).[3]

The statute does not directly address how blight is cured or eliminated. In the absence of statutory guidance, we apply well-settled rules of statutory construction and construe the statute in a manner that effectuates the intent of the General Assembly and the "beneficial purpose of the legislative measure." *Matter of Estate of Royal,* 826 P.2d 1236, 1238 (Colo.1992) (citations omitted).

The intent of Colorado's Urban Renewal Law is to prevent and eliminate the spread of blight through, where necessary, "acquisition, clearance, and disposition [of property] subject to use restrictions." § 31–25–102(2), 9 C.R.S. (2003). To accomplish this task, the General Assembly has authorized urban renewal authorities to transfer property to private entities for redevelopment. In fact, the General Assembly expressed a preference for

**2.** The United States Supreme Court considered the constitutionality of urban renewal projects that involve the condemnation of private property in *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954). In that case, the Court held private property, including structures that are not themselves substandard, may be taken to ameliorate or prevent the spread of blight. *See Berman,* 348 U.S. at 33–34, 75 S.Ct. 98. The Court further held that once an area is determined to be blighted, an urban renewal authority may transfer condemned property to a private entity for redevelopment without running afoul of the "public use" requirement of the Takings Clause of the Fifth Amendment. *Id.* at 33–34, 75 S.Ct. 98. In defense of this holding, the Court noted, "the public end [of removing blight] may be as well or better served through an agency of private enterprise than through a department of government." *Id.* at 33–34, 75 S.Ct. 98.

We adopted the *Berman* analysis in *Rabinoff v. District Court,* 145 Colo. 225, 360 P.2d 114 (1961). In *Rabinoff,* we held that where property is condemned pursuant to an urban renewal project and then sold to a private entity for redevelopment, "[t]he acquisition and transfer to private parties is a mere incident of the chief purpose of the act which is rehabilitation of the area." *Rabinoff,* 145 Colo. at 233, 360 P.2d at 119.

**3.** In 1981, when the original blight determination was made, a "blighted area" was defined in substantially similar terms, however only one of the necessary factors was required to be present. *See* § 13–25–103(2), 12B C.R.S. (1986) (repl. vol.).

ameliorating blight through private redevelopment in section 31–25–107(3.5)(g), which provides that an urban renewal plan should "afford maximum opportunity . . . for the rehabilitation or redevelopment of the urban renewal area by private enterprise." To ensure that private redevelopment accords with the goals of an urban renewal project, section 31–25–106(1) authorizes a renewal authority to sell property acquired or held by the authority "subject to such covenants, conditions, and restrictions . . . as it deems . . . necessary to carry out the purposes of [the Urban Renewal Law]."

In this case, AURA employed precisely these statutory procedures to address the blighted condition of the quarry lake. AURA sold the lake and the Arvada Marketplace parcels to Crow–CISI, a private entity, which developed the Arvada Marketplace in accordance with the purposes of the Arvada Urban Renewal plan. The deeds to both properties contain a restrictive covenant, which states that until 2016, "the Property shall only be devoted to . . . the uses specified in the . . . Arvada Urban Renewal Plan." When Crow–CISI completed the Arvada Marketplace, AURA certified that the properties "conform to the uses specified in the Arvada Urban Renewal Plan." Further, AURA stated unequivocally that the authority renounced its right of re-entry "in favor of [Crow–CISI], their successors and assigns."

After the certificate of release was issued, Crow–CISI was free to convey the lake property to Parker Ojala, another private entity. Parker Ojala, in turn, informed AURA of its plans to incorporate the lake property into its office park. Once the office park was completed, AURA again certified that the improvements added to the office park property conformed to the specifications of the renewal plan and surrendered its right of re-entry.

Under these circumstances, we hold that the quarry lake is no longer subject to the 1981 blight determination because the statutory procedures for removing blight were followed in this case. AURA disposed of the quarry lake property according to the terms of Colorado's Urban Renewal Law and certified that the uses to which the lake was devoted comported with the Arvada Urban Renewal Plan. After duly disposing of the lake property, certifying that the property was being used in accordance with the renewal plan, and having notice at all relevant times of Parker Ojala's efforts to incorporate the lake into its office park, AURA cannot now claim that the lake has never been redeveloped in accordance with the Arvada Renewal Plan. On the contrary, the quarry lake has been developed in accordance with the procedures laid out in Colorado's Urban Renewal Law and thus can no longer be considered "blighted" under the City of Arvada's 1981 finding.

## B. AURA's Condemnation Power

Having determined that the quarry lake is no longer subject to the City of Arvada's 1981 blight finding, we now consider whether AURA nonetheless retains the power to acquire the lake by exercising its condemnation power.

AURA argues that as long as the redevelopment plan is in effect, it has plenary authority to condemn "any property necessary to prevent blight or deterioration." [4] In this case, AURA contends it must exercise its condemnation powers to "prevent the spread of blight" due to the departure of the Home Base store from the Arvada Marketplace.

To support this argument, AURA cites our holding in *Rabinoff v. District Court*, 145

---

4. As an example of the extent of the power AURA claims it has, AURA's executive director, Tim Steinhaus, testified that he believed the renewal authority could "go in and buy up any property within the project area and . . . go in and condemn any property in the project area, no matter what the condition is and no matter if it had just been built."

Upon further questioning, Steinhaus went on to say that he believed the renewal authority could condemn a property simply because the authority was dissatisfied with a retailer's economic performance. Thus, for example, if AURA were dissatisfied with the economic performance of the Gart Sports store, the authority could condemn the Gart Sports store and replace it with a retailer who would generate more revenue.

As our holding below indicates, this characterization far exceeds an urban renewal authority's power to act pursuant to a municipality's initial blight determination.

Colo. 225, 360 P.2d 114 (1961), under which AURA claims an urban renewal authority may "condemn properties within an overall urban renewal area containing blight, regardless of whether the particular property being condemned is itself deemed blighted."

As an initial matter, AURA overstates the significance of our *Rabinoff* holding. In that case we held that a municipality may make blight determinations on an area-wide rather than a structure-by-structure basis. Thus, we concluded, a municipality may consider the overall character of an area in making a blight determination, and need not assess the state of every parcel and structure within the area. *See id.* at 238–29, 360 P.2d at 121. Once a municipality determines that an area is blighted and creates an urban renewal authority to address that condition, the authority may exercise its condemnation power over every parcel and structure within the urban renewal area. This holding, however, addresses only the power of an urban renewal authority to act pursuant to a municipality's *initial* determination that an area is blighted. *Rabinoff* does not address, as this case requires, whether an urban renewal authority may exercise its condemnation power over parcels that have already been sold by the authority and redeveloped in accordance with the goals of an urban renewal plan.

▮ Even if we were to construe *Rabinoff* more broadly, however, AURA's argument that it may condemn the lake property to prevent the spread of blight on the Arvada Marketplace parcel fails for another reason. Like the lake parcel, the Arvada Marketplace parcel was redeveloped in accordance with the statutory procedures laid out in our Urban Renewal Law and is therefore no longer subject to the City of Arvada's 1981 blight finding. Thus, AURA cannot condemn the lake parcel to rectify blight on the Arvada Marketplace parcel unless the City of Arvada conducts public hearings and makes a renewed finding of blight pertaining to the shopping center as well. *See* § 31–25–107(1).

The Supreme Court of Connecticut reached a similar conclusion in *Aposporos v. Urban Redevelopment Commission,* 259 Conn. 563, 790 A.2d 1167 (2002). In *Aposporos,* the plaintiffs owned a diner that was located within an urban renewal area. The urban renewal plan was first adopted in 1963 to address blight in a section of downtown Stamford. Roughly twenty years later, the plan was amended when merchants in the urban renewal area grew concerned about the effects a new mall constructed in another part of the city would have on their businesses. The amended plan called for construction of housing and retail stores in the redevelopment area and authorized the condemnation of the plaintiffs' property. Because of a downturn in the real estate market, however, that plan was never realized. A few years later, when the plan was due to expire, the renewal authority voted to extend the plan to allow economic conditions to improve. When they did, the authority again modified the plan, which called for a new construction project and authorized condemnation of the plaintiffs' property.

Under these circumstances, the Supreme Court of Connecticut held that the redevelopment authority could not rely on the initial blight finding "indefinitely to amend and extend a redevelopment plan to respond to conditions that did not exist, or to accomplish objectives that were not contemplated, at the time that the original plan was adopted." *Aposporos,* 790 A.2d at 1175. To do so, the court cautioned, would "confer on redevelopment agencies an unrestricted and unreviewable power to condemn properties for purposes not authorized by the enabling statute and to convert redevelopment areas into their perpetual fiefdoms." *Id.* The court went on to hold that the initial blight finding did not relate to the redevelopment goals identified in the amended urban renewal plan and thus found that the renewal authority had no statutory authority to condemn the plaintiff's property. *Id.* at 1176.

We agree with the conclusions reached by the *Aposporos* court, but for different reasons. We acknowledge, as AURA points out, this is not a case where the renewal authority repeatedly modified and extended the original renewal plan. Nonetheless, we hold that when AURA sought to exercise its condemnation power over the lake parcel for the benefit of the Arvada Marketplace, when neither parcel was subject to the City of Arva-

da's 1981 blight finding, it sought to exercise its powers "for purposes not authorized by the enabling statute."

 A renewal authority may engage in activity pursuant to an urban renewal plan only where "a statutorily recognized public purpose is the stated basis for [the] action." *Thornton Dev. Auth. v. Upah,* 640 F.Supp. 1071, 1081 (D.Colo.1986). This requirement ensures that condemnation actions undertaken pursuant to an urban renewal project do not run afoul of the constitutional requirement that private property be taken only for a public use. *See Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954) (urban renewal project undertaken for the purpose of eliminating blight or slum is undertaken for a valid public purpose in accordance with the Takings Clause of the Fifth Amendment).

 Under our Urban Renewal Law, the only valid public purpose for which an urban renewal plan may be adopted is to eliminate or prevent the spread of slum or blight. *See* §§ 31–25–102(1) and (2), 31–25–107(1), 9 C.R.S. (2003). *See also Rabinoff,* 145 Colo. at 234, 360 P.2d at 119 ("[T]he acquisition of properties and the elimination of their slum or blighted character constitutes a public purpose."). Once that purpose has been achieved, an authority may no longer rely on a municipality's initial blight determination to condemn property because it can no longer exercise its condemnation powers in furtherance of a valid public purpose. Thus, where blight has been eliminated from a parcel that lies within an urban renewal area, an urban renewal authority no longer has any statutory basis to exercise its condemnation power over or for the benefit of that parcel.

In accordance with our analysis above, we hold that AURA no longer has any statutory authority to condemn the quarry lake parcel.[5] As we explain above, neither the lake parcel nor the Arvada Marketplace parcel is subject

to the City of Arvada's 1981 blight finding. Thus, the statutory basis for AURA's authority to condemn the lake parcel—the elimination of blight—is no longer present. Without a statutorily recognized public purpose, AURA is powerless to exercise its condemnation power over the quarry lake parcel unless the City of Arvada makes a new determination that the area AURA seeks to condemn, in its current condition, is blighted.

## Conclusion

For the reasons given above, we reverse the trial court and remand this case to that court with directions to grant Columbine's motion to dismiss.

---

**5.** Although we hold that AURA no longer has any statutory power over the quarry lake parcel, it retains the power to enforce the restrictive covenants included in the deed to the quarry lake parcel. As AURA points out, the covenant provides that until 2016, the property must be "de-
voted to ... the uses specified in the ... plan." Thus, if the owners of the lake parcel ever cease using the lake in accordance with this covenant, AURA could rely on the deed to ensure that the purposes of the renewal plan are achieved.