Lawrence F. STEPHAN, a citizen of Illinois, and Patricia L. Stephan, a citizen of Illinois, Plaintiffs,

v.

ROCKY MOUNTAIN CHOCOLATE FACTORY, INC., a Colorado corporation, Defendant.

No. 96 C 4587.

United States District Court, N.D. Illinois, Eastern Division.

Nov. 27, 1996.

766

Mitchell Bryan, Scott Howard Reynolds, Levenfeld, Eisenberg, Janger & Glassberg, Chicago, IL, for Plaintiffs.

George N. Vurdelja, Jr., John M. Heaphy, Jr., and Griswold L. Ware, Vurdelja & Heapy, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Lawrence Stephan ("Lawrence") and his wife Patricia ("Patricia"), collectively "Stephans," have sued Rocky Mountain Chocolate Factory ("Rocky Mountain") for a declaration of rights, basing their resort to federal jurisdiction on diversity of citizenship: Stephans are Illinois citizens (Complaint ¶¶ 1 and 2), while Colorado is the site of both facets of Rocky Mountain's corporate citizenship under 28 U.S.C. § 1332(c)(1)[1] (Complaint ¶ 3). Rocky Mountain has moved alternatively for dismissal of this action under Fed.R.Civ.P. ("Rule") 12(b)(6) or for summary judgment under Rule 56. Because the parties' submissions in connection with the motion had failed to supply this Court with two documents essential to full analysis, this Court has requested and has now received copies of those missing documents. At this point the motion is fully briefed and ready for decision, and for the reasons explained hereafter both Stephans prevail—in Lawrence's case, almost despite himself.

### Background

This is the third act of a legal drama that, like most conventional dramas, involves some set changes. Act I was played out in a state court in Colorado (in the "Colorado Action"), then Act II was set in the Circuit Court of Cook County (in the "Illinois Action") and now Act III has found its way to this District Court. In the meantime a continuing entr'acte (referred to later in this opinion) is being played out on the same Circuit Court set as Act II. All of the action revolves

---

1. Further citations to Title 28 provisions will simply take the form "Section—."

around an August 16, 1991 Sublease Agreement ("Sublease") between Rocky Mountain as Sublessor and, depending on whose version is accepted, either Rocky Mountain Chocolate Factory of Illinois, Inc. ("Rocky Mountain–Illinois") or the combination of Rocky Mountain–Illinois and Stephans as Sublessee.[2]

Rocky Mountain is a franchisor of confectionery stores, while Stephans formed Rocky Mountain–Illinois to engage in a franchise operation under Rocky Mountain's auspices here in Chicago. On that same August 16, 1991 date Rocky Mountain took on the first-line responsibility for the leasing of store premises for the Rocky Mountain–Illinois operation by signing a lease with Equity Property Management Corp. ("Equity") as Lessor, so that the contemporaneously-executed Sublease required the Sublessee's performance of all of the terms of the Equity–to–Rocky–Mountain lease (the "Lease").

When Rocky Mountain–Illinois' confectionery business went sour, defaults ensued under the Sublease, so that as of May 1995 Rocky Mountain had been forced to pay Equity $23,145.38. Rocky Mountain then began Act I by suing Rocky Mountain–Illinois and Lawrence in the Colorado action, and when no appearance was filed by either defendant there, the case went to a default judgment on August 14, 1995 (that judgment is Ex. 2 to this opinion—another picture, though worth somewhat fewer words than Ex. 1, the picture of the Sublease).

Rocky Mountain–Illinois and Lawrence continued to ignore the Colorado Action judgment (which thus became final and appealable) until Rocky Mountain filed it in the Circuit Court of Cook County under the Illinois Uniform Enforcement of Foreign Judgments Act (735 ILCS 5/12–651 and –652) and proceeded with post-judgment enforcement efforts in the Illinois Action (Act II of the drama). When Lawrence was unsuccessful

there in his attempts to attack the judgment on the theories that it had been fraudulently obtained and that the Colorado court had lacked jurisdiction over him, the Illinois Action was settled: Rocky Mountain–Illinois and Lawrence paid Rocky Mountain $55,000,[3] and for its part Rocky Mountain released the judgments and judgment liens and covenanted not to sue Patricia. But the Settlement Agreement also included this reservation of rights (Settlement Agreement ¶ D):

> This Agreement does not relate to, release, waive or settle any claims or defenses among Rocky Mountain, RMCFI ["Rocky Mountain–Illinois"], L. Stephan, and P. Stephan that may arise out of the lawsuit styled *Equity Properties And Development, Inc. v. Rocky Mountain Chocolate Factory, Inc. and Rocky Mountain Chocolate Factory of Illinois, Inc.*, case number 95 M1 726198, currently pending in the Circuit Court of Cook County, Illinois, Municipal Department, First District; and the parties hereto reserve all rights of action, defenses, cross-claims and counterclaims any of them may have as of the execution date of this Agreement against the other with respect to or relating to that certain: 1) Lease Agreement dated August 16, 1991 between Equity Properties and Rocky Mountain, and 2) Sublease Agreement dated August 16, 1991 between Rocky Mountain, and RMCFI....

In the meantime Equity has continued to pursue its accruing claims against Rocky Mountain under the Lease in the Circuit Court of Cook County in a combined forcible and rent collection action (that is the ongoing entr'acte). Because Stephans fear that they will be pursued individually for the recapture of any payments that Rocky Mountain may have to make as a result of that action (or perhaps for any other claims that Rocky Mountain may assert under the Sublease),

---

**2.** Even though the Chinese proverb "One picture is worth more than ten thousand words" is no doubt deliberately hyperbolic, in this instance the attached photocopy of the Sublease (Ex. 1 to this opinion) has that kind of value for the ensuing legal analysis. And because the question of Sublessee's identity is the key issue that must be resolved later in this opinion, until that determination is made the text will simply refer to "Sub-

lessee" without repeating the disputed alternatives.

**3.** There had been another Colorado judgment entered against Rocky Mountain–Illinois and Lawrence, and the settlement covered the satisfaction of both judgments.

Stephans have brought this Act III for a declaration that they have no further financial exposure stemming from the Sublease. In turn Rocky Mountain has responded with the current motion, rather than by way of answer.

### Case or Controversy: Patricia

To narrow the area of controversy at the outset, Rocky Mountain has acknowledged in its Amended Memorandum ("Am.Mem.") 11 that it can have no further claims against Patricia under the Sublease because of its covenant not to sue her, contained in the Settlement Agreement. Accordingly there is plainly no case or controversy involving Patricia, and Stephans' Mem. 9 n. 7 therefore consents to the dismissal of her claims. Complaint Count III is consequently dismissed in its entirety, as is Count IV to the extent that it seeks to present any claim on Patricia's part.

### Case or Controversy: Lawrence

■ Article III case or controversy problems are by definition jurisdictional, so that they must be addressed at the threshold. Yet Rocky Mountain's Am. Mem. 10–11 turns to that subject only as the third of its four challenges to Stephans' lawsuit (and Stephans' Mem. 18–19 essentially follows suit by addressing that subject as the last of its four topics). That sequence in the treatment of issues on Rocky Mountain's part might create some suspicion as to its lack of confidence in the jurisdictional argument—and if so that is entirely understandable, for such lack of confidence is entirely justified.

For purposes of considering the justiciability of Section 2201 declaratory judgment actions, *GNB Battery Techs., Inc. v. Gould,* 65 F.3d 615, 620 (7th Cir.1995), quoting *Nuclear Eng'g Co. v. Scott,* 660 F.2d 241, 251–52 (7th Cir.1981) (citations omitted) has defined the Article III requirement in these terms:

> The test to be applied to determine the existence of an actual controversy in the context of a declaratory judgment action is "whether ... there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

And *Trippe Mfg. Co. v. American Power Conversion Corp.,* 46 F.3d 624, 627 (7th Cir. 1995), this time quoting *International Harvester Co. v. Deere & Co.,* 623 F.2d 1207–1210 (7th Cir.1980), has framed the concept of "sufficient immediacy and reality" in terms of whether defendant had "engaged in conduct giving rise to a reasonable apprehension on plaintiff's part that it will face suit ... or the threat of one...."

That test is plainly met here. Rocky Mountain is actively engaged in litigation with Equity as to its own ongoing liability under the Lease, having made substantial Lease payments the last time around and having then (in the Colorado Action) successfully laid off that liability onto Rocky Mountain–Illinois and Lawrence under the Sublease. If that scenario does not inspire a "reasonable apprehension" by Lawrence that he will confront a like effort by Rocky Mountain this time around, it is difficult to conceive of a situation that would fit that requirement.

For its part Rocky Mountain's Am. Mem. 10–11 urges that the matter is not ripe because several contingencies stand in the way of Lawrence's exposure to actual liability in favor of Rocky Mountain. That argument is unpersuasive in light of the high degree of probability that each of the claimed contingencies will be met (presenting a sharp contrast to the famous "choke hold" case, *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), where each of several contingencies was viewed as presenting a low level of probability, so that their combination amounted to the multiplication of a number of very small fractions and hence as constituting an impermissibly speculative prospect overall). High probabilities of the occurrence of any preconditions to suit by a declaratory judgment plaintiff, such as those involved here, are after all the reason that the case or controversy test is framed in terms of "reasonable apprehension" rather than requiring a higher level of certainty. In short, Rocky Mountain loses on the jurisdictional component of its attack.

### Abstention

■ Rocky Mountain's Am. Mem. 8–9 (its second of four contentions) advances an abstention argument, but it too fails to persuade. This case is plainly not "concurrent" with the Colorado Action. Despite Rocky Mountain's effort to suggest the contrary, the language in the Colorado judgment order about the possibility of additional future damage awards upon further application by Rocky Mountain (something that has not yet been essayed, because Rocky Mountain has not yet been stuck with any further payments to Equity) does not make that lawsuit—one that has already gone to judgment and execution—"concurrent" with today's pending declaratory judgment action. Nor is this case "parallel" to Equity's pending lawsuit against Rocky Mountain within the meaning of *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 818, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976)— in that respect see *Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc.,* 962 F.2d 698, 701 (7th Cir.1992), quoting the relevant *Colorado River* factors as set out in *LaDuke v. Burlington N.R.R.,* 879 F.2d 1556, 1559 (7th Cir.1989).

### Rule 12(b)(6)

With Rocky Mountain thus having failed in its efforts to cut Lawrence off at the pass on case or controversy and abstention theories, it is time to turn to the merits. And here the analysis will begin, as Rocky Mountain has in its motion, with consideration of Rule 12(b)(6).

For Rocky Mountain thus to style its motion in those terms ("failure to state a claim upon which relief may be granted") is a bit puzzling. Although this may merely be a matter of semantics, the relief that Lawrence seeks is declaratory: He wants a declaration of his obligations (or as he would have it, his lack of obligations) under the Sublease. And in that sense he certainly has a viable claim for relief—it has already been found that he has a real controversy with Rocky Mountain so as to satisfy the Article III requirement,

and both he and Rocky Mountain will therefore get the requested declaration of rights and duties (Rocky Mountain really wants that as well, although of course it seeks the opposite result from the one contended for by Lawrence).

To be sure, Lawrence may well lose on his legal position (that is, the relief that is granted on his claim could be an adverse rather than a favorable declaration), and in that sense it might perhaps be said that he does not "state a claim." But Rocky Mountain plainly does not seek a mere ruling that Lawrence's *pleading* is insufficient, something that most frequently leads to an opportunity to replead and that in all events is not a final order. Rocky Mountain's goal is rather an ultimate determination in its favor on the merits.

It thus appears more appropriate to deal with Rocky Mountain's motion in its alternate Rule 56 summary judgment form. If it were really not necessary to go beyond Stephan's Complaint, a Rule 12(c) motion for judgment on the pleadings might do the job (though technically such motions are reserved for cases that are fully at issue "[a]fter the pleadings are closed," while here Rocky Mountain has not yet answered). In this instance, though, it would seem to be a stretch to treat the various documentary submissions (including those that this Court has been compelled to request because the parties failed to provide them) as somehow encompassed within the Complaint (an essential condition for a Rule 12(b)(6) determination). In all events, the Rule 56 matrix of considering the evidentiary submissions received from Rocky Mountain, plus the Lease and the Franchise Agreement referred to later, is more reliable.

### Rule 56

*Claim Preclusion*

■ Lawrence first tries to foreclose Rocky Mountain from going after him for any further liability under the Sublease on claim preclusion grounds,[4] asserting that the

---

4. Though the parties' memoranda have usually referred to the older terms of res judicata and collateral estoppel, that usage is susceptible to

confusion because of the potential double meaning of the "res judicata" label. This opinion will therefore conform to this Court's regular prac-

original Colorado Action judgment bars any further litigation against him under the Sublease. That position, however, is at odds with one of the fundamental principles of claim preclusion.

For this purpose the rules of decision are provided by Colorado law under Section 1783 (*Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327, 1331, 84 L.Ed.2d 274 (1985)). To that end Stephans' Mem. 6–9 seeks to invoke the unsurprising pronouncement in *City Council of the City and County of Denver v. Block 173 Assocs.,* 814 P.2d 824, 830 (Colo.1991) that under the claim preclusion principle:

> Res judicata operates as a bar to a second action on the same claim as the one litigated in a prior proceeding when there is a final judgment, identity of subject matter, claims for relief, and parties to the action.

But Lawrence's contention fails in those very terms, for any claim to which he may potentially be subject for any further Sublease liability is plainly *not* the "same claim" that went to judgment in the Colorado Action.

It appears that no reported Colorado case has dealt with this specific question, but the universally applicable rule as to leases or other contracts calling for periodically accruing payments is that each nonpayment is treated as a separate breach, so that the injured party may sue from time to time on the breaches that have preceded each lawsuit, without thereby impairing its ability to sue separately for later breaches. Here for example is the statement of that universal proposition in *Prime Management Co. v. Steinegger,* 904 F.2d 811, 816 (2d Cir.1990) (some citations omitted):

> While a previous judgment may preclude litigation of claims that arose "prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case." Thus, when the parties have entered into a contract to be performed over a period of time and one party has sued for a breach, res judicata will preclude the party's sub-

sequent suit for any claim of breach that had occurred prior to the first suit; it will not, however, bar a subsequent suit for any breach that had not occurred when the first suit was brought. *See tenBraak v. Waffle Shops, Inc.,* 542 F.2d 919, 924 n. 6 (4th Cir.1976) (dictum) ("an action for rent not due at the commencement of a former action for rent is not barred by the former judgment"); *See generally* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4409, at [75] (1981) ("Under a single five year lease providing for sixty monthly installments of rent, for example, a suit could be brought for each unpaid installment as it fell due; a single suit, however, must include all unpaid installments due when it is filed.").

That principle kills Lawrence's argument. Because the nature and existence of Rocky Mountain's claims that existed at the commencement of the Colorado Action are a function of the contract between the parties, a brief look at the contractual documents demonstrates the applicability of the quoted rule of law.

Here are the relevant provisions of Sublease ¶¶ 1 and 4:

> 1. Sublessor shall sublease the Leased Premises to Sublessee on the same terms and conditions of the Lease, a true and correct copy of which is attached hereto and by this reference made a part hereof. References in the Lease to Lessor shall mean Sublessor and to Lessee shall mean Sublessee for the purposes of this Sublease.
>
> \* \* \* \* \* \*
>
> 4. Sublessee assumes and agrees to perform all obligations of Sublessor as set forth in the Master Lease insofar as they relate to the subleased premises as though it were Lessee under that document and as though Rocky Mountain Chocolate Factory, Inc., were Lessor.

And because the parties have now delivered the Lease at this Court's request, it is also possible to set out (with emphasis added) the

---

tice of following the lead of the Supreme Court by consistently employing the more precise "claim preclusion" and "issue preclusion" labels

(see *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 894 n. 1, 79 L.Ed.2d 56 (1984)).

applicable remedy provision in Lease § 16.2C. That provision puts flesh on the cryptic Sublease bones in the situation where, as here, the "Tenant" (which for present purposes becomes Sublessee pursuant to Sublease ¶ 1) has failed to pay one or more installments of "Rent" (which nonpayment constitutes a default under Lease § 16.1A):

> In any such case and whether or not the Leased Premises or any part thereof be relet, Tenant shall pay to Landlord the Rent and all other sums payable up to the time of such termination of this Lease or Tenant's right to possession under this Lease as aforesaid by landlord, and thereafter, *Tenant covenants and agrees to pay Landlord until the end of the Term of this Lease the equivalent of the amount of all the Rent and all other sums reserved herein required to be paid by Tenant less the net avails of such reletting, if any, and the same shall be due and payable by Tenant to Landlord on the dates ("rent days") such Rent and other sums above specified are due under this Lease. Landlord may file a suit or suits to recover any sums falling due under the terms of this Lease, from time to time.* Any reletting by Landlord shall not be construed as an election on the part of Landlord to terminate this Lease unless a notice of such intention is given by Landlord to Tenant.

If it were not for the fact that the next section of this opinion negates all liability on Lawrence's part, the documents in this case would pose an intriguing question in those terms: not as to Rocky Mountain's ability to pursue Sublessee for any further defaults (that unquestionably gets an affirmative answer) but instead as to just what those further defaults would encompass—or to state the flip side of that question, just what rents and other Lease obligations *are* claim-precluded by the judgment in the Colorado Action. For example, Stephans' Mem. 8 urges that any attempt by Rocky Mountain to collect the sum of $21,750 from Lawrence for "tenant chargeables" already owed to Equity,

an item that Sublessee had expressly committed to pay under Sublease ¶ 4[5] and that was past due and unpaid when the Colorado Action was brought, is barred in all events by claim preclusion because Rocky Mountain could have sued for that past-due amount in 1995 but did not. But on the other hand, Sublease ¶ 3 required Sublessee to make all of the Sublease payments (meaning the Lease-required payments) directly to Equity and *not* to Rocky Mountain, and Rocky Mountain has not yet been compelled to pay that $21,750 to Equity.

So at the time the Colorado Action was brought Sublessee was undeniably in breach of that $21,750 payment obligation under the Sublease, and Rocky Mountain was likewise then in breach of that identical obligation to Equity under the Lease. Is Rocky Mountain in a position to say that its actually sustaining an injury—in the form of its having to make payment to Equity—by reason of Sublessee's conceded default is a necessary ingredient of its having a ripe claim against Sublessee for that sum (in which case Rocky Mountain's not having had to lay out that amount to Equity would render claim preclusion inapplicable), or is it enough for such purposes that Sublessee had not then made the payment and that Rocky Mountain therefore had an accrued (although unpaid) $21,750 obligation to Equity (which could thus make it necessary for Rocky Mountain to have included that amount in its Colorado Action prayer for relief, on pain of losing that potential recovery via claim preclusion)? Regrettably the occasionally shallow analyses that have been tendered by the litigants have not even recognized (let alone discussed) the problem in those terms—but fortunately what follows in this opinion obviates any need to address that complex inquiry.

*Issue Preclusion*

██ If this were a game in which three strikes were out, Lawrence would already have gone down swinging, having lost on each of his previously-discussed contentions

---

5. Here is the relevant Sublease provision:
> In particular, in addition to any and all other obligations of Sublessor, it is understood that $21,750 due Landlord on the last day of the first lease year for certain improvements made

on behalf of Sublessor (ref. Paragraph 4.5A of the Master Lease) constitutes an obligation of Sublessee to be performed as though it were Lessee under that document.

of case or controversy, abstention and claim preclusion. But he is in luck, for a fourth (and independent) ground gives him an ultimate victory. That victory stems from the ensuing issue preclusion analysis, which preserves the question of his personal liability under the Sublease as a live issue for determination by this Court in the first instance.

It will be recalled that the judgment in the Colorado Action was a *default* judgment, so that Lawrence did not literally fight out the issue of his personal liability—that is, whether he properly came within the definition of "Sublessee" under the Sublease—in that lawsuit. That type of situation, posing as it does the applicability or inapplicability of issue preclusion doctrine to issues that were necessarily subsumed within a default judgment,[6] is one that has divided the courts and commentators.

If a default in answering a complaint is deemed to treat the defaulting defendant as having *admitted* its allegations (see Rule 8(d)), it would seem at least respectable to treat each essential ingredient of the plaintiff's claim as having been "actually litigated" (at least so long as the defaulting party had an adequate opportunity to do so). For example, both the Connecticut Supreme Court (in *Jackson v. R.G. Whipple, Inc.*, 225 Conn. 705, 627 A.2d 374, 378–80 (1993)) and the Virginia Supreme Court (in *Transdulles Ctr., Inc. v. Sharma*, 252 Va. 20, 472 S.E.2d 274, 275–76 (1996)) have recently held exactly that—see especially the extended and thoughtful discussion in *Jackson*, and note *Transdulles'* pronouncement of the same proposition in a fact situation strikingly similar to this one: a tenant being held liable for rent on the premise that a prior default judgment necessarily must have adjudicated the personal liability of the tenant, so that he could not relitigate the issue in a second suit for later-accruing rent. Indeed, although the proceedings in the first action in *Transdulles* may have involved more extensive proof by the plaintiff landlord than Rocky Mountain was called on to present in the Colorado Action (something that this Court can only speculate about, for it has not been part of the input from the litigants here), what was said in that case (472 S.E.2d at 276) might be repeated here in support of Rocky Mountain's position:

We disagree with the tenant's argument that before an issue may be "actually litigated" in a court proceeding, the defendant must personally appear at the hearing and contest the matter. Indeed, this Court has said that a final default judgment "imports absolute verity, and is as effectual and binding as if pronounced upon a trial upon the merits." *Neale v. Utz,* 75 Va. 480, 488 (1881).

Second, the tenant's personal liability was essential to the district court judgment. That court could have merely awarded the landlord possession of the premises without imposing personal liability for rent and fees, but it did not. Thus, the factual issue existing in the present proceedings, the tenant's liability for rent and fees, was a necessary part of the judgment in the prior proceeding.

At one time that position was "the general rule" (E.H. Schopler, Annotation, *Doctrine of Res Judicata as Applied to Default Judgments,* 77 A.L.R.2d 1410, 1419 (1961)), but the passage of time and the espousal of the contrary position in the Restatement of Judgments ("Restatement") have brought the majority of courts into line as rejecting issue preclusion in such default circumstances. Restatement (2d) § 27 cmt. e says flatly:

A judgment is not conclusive in a subsequent action as to issues which might have been litigated but were not litigated and determined in the prior action.

\* \* \* \* \* \*

In the case of a judgment entered by confession, consent or default, none of the issues is actually litigated. Therefore, the rule of this Section [which renders a determination conclusive in a subsequent action between the parties, whether on the same or a different claim, '[w]hen an issue of fact or law is actually litigated and determined

---

6. That of course was true here. Rocky Mountain's Complaint in the Colorado Action said that Lawrence *was* a Sublessee and was hence personally liable, and had that not been so the judgment there could not have run against Lawrence as a joint debtor.

by a valid and final judgment'] does not apply with respect to any issue in a subsequent action.

In even stronger terms, 18 Charles Wright, Arthur Miller & Edward Cooper, *Federal Practice and Procedure: Jurisdiction* (1981) ("Wright, Miller & Cooper") attack the viewpoint exemplified by what was once the "general rule" and by the recent Connecticut and Virginia Supreme Court decisions to the same effect as essentially unprincipled—as the authors state *(id.* § 4467, at 643 (footnote omitted)):

> As a different example, a few misguided courts may persist in the belief that issue preclusion arises from a default judgment. It would be outrageous to compel other courts to adhere to this view.[7]

As for Colorado itself, both the litigants and this Court have been able to locate only one reported decision that bears at all on the issue. *Ortega v. Board of County Comm'rs,* 683 P.2d 819, 821 (Colo.Ct.App.1984) (citation omitted) has said, in the context of a second lawsuit in which the plaintiff has been a defaulting defendant in an earlier action:

> The default judgment in the first action was a final judgment, which "precludes the relitigation, not only of the issues which were actually litigated in the first action, but also of all grounds of claim and defense which might have been properly litigated in the first action but were not litigated or decided." Therefore, where, as here, a default judgment has been entered against a party who later seeks to litigate an issue disposed of in the prior litigation, the subsequent action is barred.

But that statement must be read in light of the immediately ensuing explanation of what had happened in the earlier lawsuit *(id.):*

Ortega was a party in the first action, in which the record reveals the following events: The trial court ordered Ortega to appear before it to show cause why a preliminary injunction should not issue, and later ordered Ortega to answer or otherwise plead within ten days. Ortega's motion to dismiss the complaint was considered and denied by the court. Thus, Ortega had a full and fair opportunity to litigate the issue in the prior adjudication, and the judgment entered in that action operates to bar relitigation. Ortega cannot now assert a claim which would, in effect, reverse the default judgment against him.

That level of participation by the defaulted party, rather than the total absence of participation that marked the involvement (or more accurately noninvolvement) of defendants Lawrence and Rocky Mountain–Illinois in the Colorado Action, was also true of the situations in the *Jackson* and *Transdulles* lawsuits. And on that score, the thoughtful discussion in *In re Bernstein,* 197 B.R. 475, 480–82 (Bankr.D.Md.1996) explains why "[a] majority of courts will differentiate between a default judgment where the defendant makes no appearance and a judgment granted after a defendant files an answer, but fails to appear at trial" *(id.* at 481)—and see, e.g., stating and applying the same distinction, *In re Garner,* 56 F.3d 677, 680 (5th Cir.1995). That distinction serves to explain away a good many of the more modern cases that choose to adhere to what used to be the majority rule, which expressly conferred issue preclusion results in default situations.

On balance this Court, in its predictive rule mandated by *Erie v. Tompkins,* finds that *Ortega* would not control the very different situation presented by this action if the matter were tendered to the Colorado Supreme

---

7. [Footnote by this Court] This Court has, at the invitation of publisher Matthew Bender & Co., just completed a total rewrite of Chapter 12 of *Moore's Federal Practice,* which has in the works a brand new revision (not just an amended version) of that treatise. That experience has taught how tempting it is for any commentator to pontificate when the writer's views are being voiced in a forum where the criticized court has no opportunity to respond. It seems to this Court that such opportunities for the exercise of hubris ought to be resisted. In this instance such restraint would seem particularly appropriate, given the fact that the same point of view as that expressed in *Jackson* and *Transdulles* has been shared by no lesser body than the United States Supreme Court (see *Last Chance Mining Co. v. Tyler Mining Co.,* 157 U.S. 683, 689–95, 15 S.Ct. 733, 736–37, 39 L.Ed. 859 (1895), and see the more extended discussion in 18 Wright, Miller & Cooper § 4442).

Court. Instead it concludes that the rule stated by the Restatement, by a large majority of the federal courts (see, e.g., 18 Wright, Miller & Cooper § 4442, at 375 & n. 3 and *id.* 1996 supp. at 287 & n. 3, and cases cited there, including *United States v. Bailey,* 957 F.2d 439, 443 (7th Cir.1992)) and by such commentators as Wright, Miller & Cooper would also be adopted as the Colorado rule of decision: No issue-preclusive effect is to be accorded to the Colorado Action as to the question of Lawrence's personal liability under the Sublease.

### *Lawrence's Personal Liability*

At long last, then, the merits of that issue may be addressed de novo. For that purpose it is important to look not only at the Sublease but at the Franchise Agreement ("FA") that gave rise to the Sublease's execution (see Recital B to the latter document).[8]

■ As the Sublease's introductory paragraph reflects, it speaks of the Sublessee as "Rocky Mountain Chocolate Factory of Illinois, Inc., an Illinois corporation (Lawrence F. Stephan and Patricia L. Stephan, personally)." But when it came to the execution of that document, the typewritten lines reading "By: Lawrence F. Stephan, personally" and "By: Patricia L. Stephan, personally" were physically stricken through, and the *only* capacity in which Lawrence signed the document was in the line immediately below the typed Rocky Mountain–Illinois corporate name. There he simply signed on a line that read "By: Lawrence F. Stephan."

It might perhaps be argued that the just-described differential between the language in the Sublease's preliminary paragraph and the totally limited nature of Lawrence's execution of the signature page somehow created an ambiguity as to Lawrence's status. But any such contention is really unpersuasive—instead the far more sensible reading would certainly give effect to the deliberate striking out of all references to personal liability and to Lawrence's having signed the document only once, in the space that was provided for his doing so *on behalf of the*

*corporation.* On the basis of the Sublease alone, then, Lawrence is not embraced within the term "Sublessee" and hence is not personally responsible for Sublessee's default.

Moreover, even if some ambiguity were somehow to be found in that respect (contrary to what is clearly the common-sense construction of the Sublease), that common-sense reading might perhaps be buttressed by throwing into the scales the potential application of Colorado's adherence to the doctrine of contra proferentem, *United States Fidelity & Guaranty Co. v. Budget Rent–A–Car Sys., Inc.,* 842 P.2d 208, 211 (Colo.1992) (en banc), where the court stated as to a rental agreement:

> Where the terms of a contract are ambiguous, they must be strictly construed against the party drafting the contract.

In what would seem to be most likely in light of the parties' relationship, that would appear to cut against Rocky Mountain. But because this Court has nothing specific to confirm the identity of the Sublease's drafter, it will not indulge any such assumption as an added element supporting its conclusion.

That possible assumption, however, plainly becomes an established premise when it comes to the 40–plus–page (without even counting the several exhibits) FA—the document that established the relationship pursuant to which the Sublease was entered into. And in that closely-related document the evidence of Lawrence's total lack of personal liability is really overwhelming. Here is a recital of the relevant provisions of the FA (which is obviously Rocky Mountain's standard form, minimally modified as needed to adapt to the particular transaction):

> 1. FA ¶ 1.1 expressly names only "Rocky Mountain Chocolate of IL, Inc." as the Franchisee, and FA ¶ 1.2 specifies that the Agreement is entered into between *that* Franchisee and Rocky Mountain. Then throughout the lengthy document the Franchisee is referred to in terms of "it"— though that alone is not of course a strong indicator, it is at least an item that sup-

---

8. As stated earlier, although the FA had not been part of the parties' original transmittals to this

Court, it has been submitted at this Court's request.

ports the notion that the entity rather than any individual is the franchisee.

2. FA ¶ 9.4 conveys the same idea that the individuals involved in the ownership and management of Rocky Mountain–Illinois (including Lawrence) are *not* themselves Franchisees:

> 9.4 *Beneficial Owners and Directors.* FRANCHISEE represents and FRANCHISOR enters into this Agreement in reliance upon the representation that the individuals listed on *EXHIBIT "E"* are the sole beneficial owners (in the stated proportions) and directors of FRANCHISEE.

3. Importantly, Rocky Mountain had prepared the FA signature page (a photocopy of which is attached as Ex. 3) in a way that would apparently seek to have rendered Lawrence and the other principals individually liable—but each of them specifically struck through the word "Individual" next to their names, in each instance adding a now-illegible but presumably disclamatory legend that was apparently then lined out by Rocky Mountain's representative.[9] Even leaving aside that last factor of the added legend, there can be no question that Lawrence and the others signing on behalf of Rocky Mountain–Illinois *specifically* rejected any individual responsibility.

4. Most significantly, Rocky Mountain attached as FA Ex. E (the Exhibit cross-referenced in FA ¶ 9.4) a "Nondisclosure and Noncompetition Agreement" that, rather than speaking directly to the issues indicated by that caption, read:

> THE UNDERSIGNED, being the beneficial owners, directors and principal officers of the ROCKY MOUNTAIN CHOCOLATE FACTORY OF IL in consideration of the execution of a Franchise Agreement dated July/31/1988 between Rocky Mountain Chocolate Factory, Inc. ("FRANCHISOR") and Rocky Mountain Chocolate of IL Inc. ("FRANCHISEE") and as a prerequisite to the execution thereof, do each hereby agree to individually comply with and be bound by all provisions of said Franchise Agreement and to guarantee any performance and compliance with the FRANCHISEE thereunder, jointly and severally, without requiring FRANCHISOR to first exhaust any of its rights or remedies against any other party.

This Nondisclosure and Noncompetition Agreement shall be executed by all persons and other legal entities who shall form time to time be the beneficial owners, directors and principal officers of FRANCHISEE and the execution hereof by all such persons and legal entities shall be the responsibility of the undersigned.

That personal undertaking would of course have been unnecessary if Lawrence (for example) had already accepted personal liability by executing the FA—and that personal undertaking was not signed by Lawrence or the others either. In addition, Ex. E itself reconfirms that only Rocky Mountain–Illinois, and *not* Lawrence and the other individuals, was the Franchisee.

Finally, of course, there can be no disputing that the contra proferentem doctrine does apply to the FA.

In summary, there is no doubt whatever that Rocky Mountain sought to get Lawrence (and the others) on the hook personally for performance of the FA, but there is equally no doubt that it was unsuccessful in doing so. And that is all of a piece with what has already been submitted and said in connection with the Sublease, where Rocky Mountain tried the same thing with an equal lack of success. This Court accordingly holds that the nature of the signatures on the Sublease clearly demonstrates that the *only* parties to that document were Rocky Mountain as Sublessor and Rocky Mountain–Illinois as Sublessee, so that Lawrence consequently has *no* personal liability for its performance.

### Conclusion

There is indeed no genuine issue of material fact, and the consequence under Rule 56 is

---

9. Note the handwritten statement at the lower right of the signature page. Was Rocky Mountain trying to pull a fast one?

the entry of a judgment as a matter of law—but in this instance that judgment is the opposite from the one contended for by Rocky Mountain. That calls for the disposition of the parties' controversy in this manner:

1. Rocky Mountain's Rule 12(b)(6) motion is denied.

2. With the agreement of all parties that Patricia has no liability to Rocky Mountain, all of Complaint Count III, and Count IV to the extent that Patricia is a plaintiff, are dismissed.

3. This Court declares that Lawrence is neither a party to nor a surety of Sublessee's obligations under the Sublease and thus has no personal liability to Rocky Mountain for any claims or damages that may have accrued against or be recoverable from Sublessee following the filing of the Complaint in the Colorado Action, or that may hereafter accrue against or be recoverable from Sublessee (Complaint Count II).

4. Complaint Count I is dismissed as an inaccurate statement of the applicable law, and Complaint Count IV is dismissed as moot.

This therefore is a final order disposing of all aspects of the litigation between the parties.

# SUBLEASE AGREEMENT

This Sublease Agreement ("Sublease") is made this _16_ day of __August_____, 199_1_, by and between Rocky Mountain Chocolate Factory, Inc., a Colorado Corporation ("Sublessor"), and Rocky Mountain Chocolate Factory of Illinois, Inc., an Illinois Corporation (Lawrence F. Stephan and Patricia L. Stephan, personally) ("Sublessee").

## RECITALS

A. Sublessor as Lessee entered in a certain lease (the "Lease") dated __August 16_____, 1991_, with Equity Properties and Development Company, a division of Equity Property Management Corp., an Illinois corporation, whose address is Two North Riverside Plaza, Suite 1000, Chicago, Illinois 60606, as Lessor for the operation of its business under the trade name "Rocky Mountain Chocolate Factory" in certain premises located at Two North Riverside Plaza, Chicago, Illinois 60606 (the "Leased Premises").

B. Sublessor and Sublessee have entered into a Franchise Agreement to transfer the operation of Sublessor's business to Sublessee.

Now therefore for good and substantial consideration, the parties agree as follows:

1. Sublessor shall sublease the Leased Premises to Sublessee on the same terms and conditions of the Lease, a true and correct copy of which is attached hereto and by this reference made a part hereof. References in the Lease to Lessor shall mean Sublessor and to Lessee shall mean Sublessee for the purposes of this Sublease. The Lease is for a nine (9) year term which commenced on __November 12__, 1991_, and will terminate on December 31, 2000, the last day of the ninth full Lease Year. The Term of this Sublease shall commence on __November 12__, 1991_, and shall terminate one day before the termination date of the Term of the Lease or any extension thereto.

2. Sublessee agrees that the sole purpose of this Sublease is to accommodate the continued operation of Rocky Mountain Chocolate Factory on the Leased Premises. Therefore the cessation of the operation of the Rocky Mountain Chocolate Factory for the display and sale of fudge, chocolates, candies, as well as related novelty and gift items, and/or the use of the trade name Rocky Mountain Chocolate Factory continuously during the entire Term of this Sublease shall constitute a material default of the Sublease and shall entitle Sublessor to all of its rights and remedies under the law and in addition those specifically set forth under the default provisions under the Lease.

3. All payments required of Sublessee under this Sublease shall be made in accordance with the provisions of the Lease to Lessor:

> Equity Properties and Development Company,
> Two North Riverside Plaza, Suite 1000
> Chicago, Illinois 60606

The addresses for the parties for notices shall be the address set forth for Sublessor:

> Rocky Mountain Chocolate Factory, Inc.
> 265 Turner Drive
> Durango, Colorado 81301

and for Sublessee at the leased Premises.

4. Sublessee assumes and agrees to perform all obligations of Sublessor as set forth in the Master Lease insofar as they relate to the subleased premises as though it were Lessee under that document and as though Rocky Mountain Chocolate Factory, Inc., were Lessor. In particular, in addition to any and all other obligations of Sublessor, it is understood that $21,750 due Landlord on the last day of the first lease year for certain improvements made on behalf of Sublessor (ref. Paragraph 4.5A. of the Master Lease) constitutes an obligation of Sublessee to be performed as though it were Lessee under that document. In the event Sublessee defaults in the performance of such obligations, Sublessor shall have the right to repossess the premises upon the same terms and conditions as specified in the Master Lease.

5. Sublessee shall have no right to prepare plans or effect tenant's improvements to the premises except as may otherwise be agreed upon in writing by Sublessor, which agreement shall not be unreasonably denied.

6. At the conclusion of the term of this Sublease, Sublessee shall, at its own expense, if requested by Sublessor or Lessor, remove all such changes or alterations and restore premises to the condition which would have existed had not such changes or alterations been made, reasonable wear and tear excepted.

7. This Sublease is subject to Lessor's written consent as required under the Lease and shall be effective only upon such consent.

8. This Sublease shall be governed and construed under and in accordance with the laws of the State of Colorado. The parties hereby agree that any disputes between them will be resolved, if legally possible, in a forum of state court, located within the County of La Plata, State of Colorado.

Lessor:     Equity Properties and Development Company, a division of Equity Property Management Corp., an Illinois corporation

By: _____

Its: _____

Sublessor:   Rocky Mountain Chocolate Factory, Inc., a Colorado corporation

By:   Franklin E. Crail
Its:   President

Sublessee:     Rocky Mountain Chocolate Factory of Illinois, Inc., an Illinois corporation

By:   Lawrence F. Stephan
Its:  President

By:   Lawrence F. Stephan, personally

By:   Patricia L. Stephan, personally

DISTRICT COURT, COUNTY OF LA PLATA, STATE OF COLORADO

Case No. 95 CV 91

JUDGMENT

Rocky Mountain Chocolate Factory, Inc., a Colorado corporation,

Plaintiff,

v.

Rocky Mountain Chocolate of Illinois, Inc., and Lawrence Stephan,

Defendant.

On application of Plaintiff for Judgment it appearing that Defendants, Lawrence Stephan and Rocky Mountain Chocolate of Illinois, Inc., have been served with a Summons and Complaint in this action, and have failed to file an Answer or other appearance within the time permitted by law, and it appearing that venue is appropriate and that this Court has jurisdiction over the Defendants, and it further appearing that the Plaintiff has filed an Affidavit that the Defendants owe Plaintiff the sums set forth below and that the Defendants are not in the Military Service of the United States of America and are not an infant or incompetent person.

NOW THEREFORE the default of the Defendants is noted and entered of record and judgment is entered in favor of Plaintiff, Rocky Mountain Chocolate Factory, Inc., and against the Defendants Rocky Mountain Chocolate of Illinois Inc., and Lawrence Stephan in the sums of $28,145.38, together with interest thereon at the legal rate from May 15, 1995, costs expended in the sum of $156.50 and reasonable attorneys fees of $1,605.00. Additional sums for future damages may be awarded at a later date upon appropriate application and presentations of adequate proof to the Court.

Dated this _14th_ day of _August_, 1995.

By the Court:

_____
District Court Judge

c:\wp\1573\110\pleading\judgmt.pld

xc: K. Newbold

entering into this Agreement, that it understands the nature of this Agreement and license and its status as FRANCHISEE hereunder and that it intends to comply therewith and be bound thereby.

This Agreement is dated effective ("Effective Date") July 31, 1988. THIS AGREEMENT IS NOT EFFECTIVE UNLESS AND UNTIL IT IS DULY EXECUTED BY FRANCHISOR. The term of this agreement will run five (5) years from store opening.

FRANCHISEE: Rocky Mountain of IL Inc.

By; Lawrence Stephan Individual

By; Ron Mangelsdorf Individual

By; Pat Stephan Individual

By; Pat Mangelsdorf Individual

FRANCHISOR:

Rocky Mountain Chocolate Factory, Inc., a Colorado Corporation

By: Kayo Folsom

Its Vice President/Franchise Development

*These were signed separately by us. RMCF lined out these per deT & never told us.*

41

Exhibit
3